## Richmond

## S. Baron Baird, Jr. v. Dodson Brothers Exterminating Company, Incorporated.

March 4, 1977.

Record No. 760374.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Harman and Compton, JJ.

*Enos Richardson, Jr.*, for plaintiff in error.

*William B. McLeod*, for defendant in error.

Cochran, J., delivered the opinion of the court.

S. Baron Baird, Jr., as plaintiff, filed a motion for judgment in the trial court against Dodson Brothers Exterminating Company, Incorporated (Dodson), defendant, seeking damages alleged to have resulted from Dodson's breach of a contract to control certain wood-eating insects on Baird's property. In a jury trial a verdict was returned for plaintiff in the amount of $8,640, which, upon defendant's motion, was set aside by the trial court,

and judgment was entered for the defendant on November 26, 1975.

The sole question on appeal is whether there was sufficient evidence to support the jury verdict in favor of Baird.

Since 1946, Baird and his wife had resided in a frame house on Baird's farm in Essex County. In 1968, W. I. Shackelford, Dodson's representative, inspected the dwelling and informed Baird that there was termite damage under the northeast corner of the dining room. On March 15, 1968, a contract for treatment of the property was signed for Dodson by Shackelford, and for Baird by his wife. On the same day Dodson's employees treated the property. For this initial treatment Baird paid Dodson the sum of $173.50 by check dated March 19, 1968, and received a one-year, bonded guarantee. In accordance with the contract provisions Baird renewed the contract annually by paying $22.50 for each of the years 1969, 1970, 1971, 1972, 1973, and 1974.

Under the contract Dodson agreed to treat Baird's property for "Subterranean Termites" and for "Powder Post Beetles" as specified on a "graph sheet" and itemized list attached to and incorporated in the contract. The list indicated that a chemical spray was to be used in the treatment. Dodson further agreed "to make any necessary retreatment for the control of the above mentioned wood destroying insects" at no additional charge and to inspect the property at least once each year. The contract also provided that Dodson would not be responsible for damages except those due to its "neglect".

The graph sheet was an inspection report prepared by Shackelford, containing a diagram of the basement and crawl area under the first floor. No insect infestation was shown on the report. On the back of the graph sheet was a list of services to be performed by Dodson if specified. Blank spaces were filled to indicate that services were to be furnished as specified to insulate the building against both termites and powder-post beetles. In the blank space at Item 14, however, providing for treatment for powder-post beetles with Dodson Beetle Toxic, was written the word "No".

Baird testified that on the first visit Shackelford inspected the property by going "through the house", "under" it, and "around" it to determine whether there was any damage caused by

insects. Immediately after the initial treatment Baird employed a local carpenter to place a new sill and extra footing under the northeast corner of the dining room to repair what Shackelford had said was the only damage that he could find. About the same time, either shortly before or shortly after the 1968 treatment, Baird put new joists under the kitchen to level the floor and added a storage area.

Over a period of several days in 1969 or 1970, Baird and his wife saw what they thought were termites in the dining room and outside the house. In two successive years Baird wrote on his annual renewal check to Dodson a request that the exterminating company determine what the insects were. In 1972, he tried without success to communicate by telephone with Dodson's representative, Thompson, because the Bairds had seen more insects and had observed that the floors in the dining room and living room were beginning to "give". His calls to Thompson were never returned. In 1973, after cracks in the floor of the hallway and stairway were observed, Mrs. Baird talked with Thompson by telephone, and Thompson came to the residence, but Baird did not see him. The next year, when floors were "giving" throughout the house, Baird had his attorney communicate with Dodson. Thompson returned, and Dodson employees re-treated the house. Nevertheless, the residence was badly damaged. Baird testified that prior to the 1968 treatment he had not had any trouble with wood-destructive insects.

Mrs. Baird's testimony was corroborative of her husband's. She also testified that Thompson came to the property in early 1974, inspected the area under the first floor, and told her that there were powder-post beetles under the house and that if it were his house he would "bulldoze it down". He requested that she obtain two estimates of the cost of repairing the damage, and this was done. She conceded that only the floor in one room, which was not damaged by insects, had been refinished since 1968.

William H. Robinson, Assistant Professor of Entomology at Virginia Polytechnic Institute and State University, described the distinctive characteristics, life cycles, and eating habits of termites and powder-post beetles. He identified damage to joists and floor boards taken from the Baird house as having been caused by these two kinds of wood-devouring insects. He could

not determine when the damage was done, since there were no live insects in the wood samples when he examined them; the damage could have occurred either before or after 1968. Robinson also testified that once a floor was finished, powder-post beetles would probably not infest it, as these insects generally bore into untreated wood.

Edward Beane, Jr., trained in the exterminating business by Dodson but employed by a competing company, testified that he inspected the Baird house prior to trial. He found "heavy and extensive termite damage" under the first floor and powder-post beetle damage under the dining room area. Having observed sawdust drifting out of the powder-post beetle holes, he testified that the infestation appeared to be of recent origin "because it seems to be active". He found no active infestation of termites.

Perry T. Allen, a contractor, testified for the plaintiff as to damages. In his inspection Allen discovered that the first floor had settled in three different places and that 75% of the floor joists he examined had been damaged by insects. To repair the damage, in his opinion, it would be necessary to replace floor joists and sills on the first floor, flooring on the first and second floors, and the wall on the north side of the house. It would also be necessary to jack the floor joists on the first floor to level the house. He estimated the cost of materials at $9,600 and labor at $12,000, making a total of $21,600, of which the cost of materials and labor for replacing the flooring was $5,000.

The evidence for Dodson consisted of the testimony of three of its employees. This evidence was to the effect that the damage must have occurred before 1968, and that there was no active infestation of termites or powder-post beetles in 1974, when they inspected the property and re-treated it. E. J. Lupini, district manager of Dodson's Richmond office during the period in question, testified that the second floor of the Baird house was not treated for powder-post beetles because such treatment above the first floor would have required that the house be vacated, sealed, and fumigated with gas. While conceding that the Baird contract stated that the house had been treated for powder-post beetles, Lupini maintained that the contract only contemplated treatment for those insects under the first floor, where liquid chemical spray would be used. He could not explain why Shackelford, who had since died, failed to show on his graph sheet the area of infestation at the time of his inspection.

Dodson, acknowledging that the contract required it to make annual inspections and, if infestation appeared, to re-treat the property in order to control the insects, argues that the undisputed evidence showed that it made the required annual inspections and re-treated the Baird house at least once, thereby establishing compliance with its contractual obligations.

We do not agree. To accept such a contention would lead to the untenable conclusion that mere inspection, however casual or cursory and ineffectual to disclose obvious damage, would insulate Dodson from liability. This result would reward inaction or negligent performance by Dodson, and would defeat the purpose of the contract to protect Baird's residence from further insect damage.

As Dodson's counsel suggested in oral argument, the contract may have been inartfully drafted, but imprecise draftsmanship affords no relief to Dodson, for it prepared the contract. Therefore, any ambiguities must be resolved against Dodson. *Lipscombe* v. *Security Ins.*, 213 Va. 81, 84, 189 S.E.2d 320, 323 (1972). Nevertheless, we will assume that the parties did not contract for treatment of the Baird house above the first floor. Even so, it was a question of fact whether Dodson breached its contract to control the specified insects.

Under the provisions of Code § 8-352 (Repl. Vol. 1957) the trial court set aside the jury verdict for the plaintiff as being without evidence to support it and entered judgment for the defendant. Under such circumstances, of course, the verdict is not entitled to the same weight as one which has been approved by the trial court. *Guill* v. *Aaron*, 207 Va. 393, 396, 150 S.E.2d 95, 98 (1966). However, if there was any credible evidence to support the verdict, the trial court erred in setting it aside. *Commonwealth* v. *McNeely*, 204 Va. 218, 129 S.E.2d 687 (1963).

Dodson cannot ignore or disavow the report of its initial inspection. Indeed, its counsel conceded in oral argument before us that Dodson had an obligation to determine by that inspection what the termite and powder-post beetle damage was. Therefore, we believe that a jury could reasonably infer from the evidence that at the time of Shackelford's inspection, the only damage to the Baird house, exclusive of damage above the first floor, was that which Shackelford orally reported to Baird; that Baird repaired the damage; and that additional damage,

reasonably foreseeable by the parties, thereafter occurred which would have been avoided if Dodson had properly performed its agreement to inspect, treat, reinspect, and re-treat the house.

This is a case of first impression for us. Courts in other jurisdictions, however, have construed similar contracts. Thus, in *Orkin Exterminating Co. v. Buchanan,* 108 Ga. App. 449, 133 S.E.2d 635 (1963), it was held that such a contract, if it did not expressly so provide, fairly implied that the pest control company would accomplish the desired result of preventing further damage to the landowner's home from the activities of insects. Therefore, it was a jury question whether insect damage resulted from infestation before or after treatment, and a verdict was upheld for the reasonable cost of repairing a house that was damaged after treatment. *See also Orkin Exterminating Company, Inc. v. Mixon,* 130 Ga. App. 885, 205 S.E.2d 13 (1974); *Alabama Terminix Company v. Howell,* 276 Ala. 59, 158 So.2d 915 (1963); *Orkin Exterminating Co. v. Gulf Coast Rice Mills,* 343 S.W.2d 768 (Tex. Civ. App. 1961); *Brown v. Battle,* 220 Miss. 530, 71 So.2d 790 (1954); Annot., 43 ALR2d 1237; *cf. Orkin Exterminating Company, Inc. v. Stevens,* 130 Ga. App. 363, 203 S.E.2d 587 (1973), distinguishable as a tort action where the contract contained a limitation of liability.

Here, there was evidence of damage to the first floor, joists, and sills from both termites and powder-post beetles. There was evidence that the cost of repairing all damage to the house would be $21,600. If the cost of replacing flooring, including that on the first floor as well as that on the second, is eliminated, the cost of repair would be $15,600, still substantially higher than the jury verdict.

We conclude that there was sufficient evidence to support the verdict of the jury both as to liability and as to damages, and we will therefore reverse the order of the trial court, reinstate the verdict, and enter final judgment thereon for the plaintiff.

*Judgment reversed, verdict of the jury reinstated, and final judgment.*