**Richmond**

T. M. GRAVES CONSTRUCTION, INC.

V.

NATIONAL CELLULOSE CORP.

September 9, 1983.

Record No. 810223.

Present: All the Justices.

*Sandy T. Tucker (Robert N. Pollard; Thomas S. Winston, III; Williams, Mullen, Christian, Pollard & Gray,* on briefs), for appellants.

*Richard K. Bennett (John M. Claytor; Browder, Russell, Morris & Butcher,* on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

This is a negligence action arising out of the construction of a gymnasium at the St. Christopher's School (St. Christopher's) in Richmond, Virginia, in 1975. T. M. Graves Construction, Inc. (Graves) was the general contractor. Graves subcontracted a portion of the work to Weiler Thermospray Company (Weiler), whose job it was to apply a certain type of spray-on insulation to the ceiling and portions of the walls in the new gym. Weiler was a "franchise applicator" for National Cellulose Corporation's (National's) "K-13" spray-on insulating material.[1] Because of the size of the job and the inexperience of its men, Weiler asked National for assistance.

National dispatched one of its field experts to Richmond who trained Weiler's men, made repairs on the spraying equipment, oversaw the setting up of the equipment, adjusted and set the controls on the equipment, and started spraying the insulation. Once the job was underway, National's representative directed Weiler's men not to alter the settings on the equipment and to carry on with the work as he had shown them.

Within one year after completion of work, the insulation began falling off the ceiling and walls of the gym. At trial, it was undisputed that the insulation fell because it did not contain sufficient glue to hold it in place.

Graves sued National[2] claiming that National "negligently and defectively applied the insulation." A jury returned a verdict in

[1] This type insulation is a mixture of dry fiber and glue. The fiber is blown through a blowing machine. The blowing machine can be set on "Low, Medium, or Hi" speeds. The setting controls the rate of flow of the fiber. The glue is pumped through a pump machine and shot out through an eight-jet nozzle. The pressure on the pump machine is variable: the greater the pressure the greater the amount of glue that passes through the nozzle. The hose that blows the fiber and the nozzle that shoots the glue are bound together in such a way that the fiber and glue mix in mid-air then hit the surface on which they are being sprayed. Typically, if the fiber and glue are properly mixed, the insulating material will adhere.

[2] Originally, Church Schools in the Diocese of Virginia, the entity which operates St. Christopher's School, sued Graves. *Church Schools in the Diocese of Virginia v. T. M. Graves Construction, Inc.*, at Law No. 1418 (Circuit Court of the City of Richmond, Division I, filed November 24, 1978). Thereafter, in that same action, Graves filed third party claims against several entities and one individual. Those claims resulted in a suit styled *Church Schools in the Diocese of Virginia v. T. M. Graves Construction, Inc. v. National Cellulose Corporation, T. Anthony Weiler, Weiler Insulating Company, Weiler Thermospray Co., and Glave, Newman, Anderson & Associates, Inc.* Prior to trial, Graves conceded liability to Church Schools and agreed to the entry of summary judgment in Church Schools' favor, which was done; Weiler Insulating Company filed bankruptcy proceedings

favor of Graves. The trial court set the verdict aside; it ruled that there existed a variance between Graves' pleading and its proof and that the evidence was insufficient to support the verdict. Moreover, in setting aside the verdict, the trial court did not consider all the evidence; instead, it considered only plaintiff's evidence as if it were ruling on a motion to strike at the close of plaintiff's case.

On appeal, Graves contends that the word "applied" was a term of art with regard to National's business and was broad enough to encompass Graves' proof without causing any surprise to National; that on a motion to set aside a jury verdict the trial court is required to consider the same evidence considered by the jury, that is, all the evidence; and that had the trial court considered all the evidence it would have found credible evidence to support the verdict. We agree with appellant's contentions; therefore, we will reverse the decision of the trial court and enter final judgment in favor of appellant.

## I.

In this case, the question of variance between pleading and proof is not difficult to resolve. The central focus is whether National was fairly on notice of the claim against it so that it was not surprised by Graves' proof. In *Kennedy v. Mullins,* 155 Va. 166, 179, 154 S.E. 568, 572 (1930), we said that "If the notice be such that the defendant cannot mistake the object of the motion, it is sufficient." There, we upheld a jury verdict on the ground that even if a variance existed, defendant was not surprised by it. In *Kennedy,* we went on to discuss the element of surprise as it relates to the question of variance:

> The rule that the proofs must correspond with the allegation is fully recognized, but like every other rule should be reasonably applied. *Its purpose is to prevent surprise. Where there is no surprise to the party invoking it, there is no good reason for enforcing the rule.*

*Id.* at 180, 154 S.E. at 572 (emphasis added); *accord Caputo v. Holt, Administratrix,* 217 Va. 302, 228 S.E.2d 134 (1976). Thus,

in federal court and moved for a stay, which was granted; all the other parties, except National, were removed either by Graves' taking a nonsuit or by order of court. The result was a proceeding involving only Graves and National.

in the instant appeal, if it appears that National was not surprised by Graves' proof, a variance between pleading and proof cannot serve to overturn the jury's verdict. *See* Code § 8.01-377. *See also* Rule 1:4(d).

■ The trial court found a fatal variance because, in its view, plaintiff alleged that National "negligently and defectively applied the insulation," but proved, if anything, that National was "negligent [in] setting up [the] equipment." Stated succinctly, the issue is whether negligent application encompasses negligent setting up of the equipment. Admissions by National's counsel and evidence adduced at trial leave no doubt that the former encompasses the latter.

In a statement to the trial court, out of the presence of the jury, National's counsel referred to National's "application manual" and advised the court that portions of it would be put into evidence. The manual, the full title of which is *"APPLICATION MANUAL OF K-13 SPRAY-ON-SYSTEMS* (September 1, 1974)" was introduced into evidence as Defendant's Exhibit 3. In its Index under "II. *COMPONENT EQUIPMENT AND FUNCTIONS,"* it refers to "Schematic of System Equipment Set-Up."

William Murphey, one of plaintiff's witnesses and a former employee of Weiler, testified that the application process included setting up the equipment. Thomas Weiler, another of plaintiff's witnesses, gave similar testimony. More specifically he said that, "determining the rate of flow of the fiber and the rate of the flow of the glue is all included in the application process." These determinations were made when the equipment was set up.

Perhaps of most significance is that defendant's key witness, Marvin Giffin, who was described as one of National's "field experts" in the application of K-13 insulating material, also said that setting up equipment is part of the application process. He admitted that setting the rate of flow of glue and fiber on the equipment was part of the work he was required by National to do on the St. Christopher's job.

In light of the foregoing, we think that the word "applied" as used by Graves fully and fairly encompasses the setting up of the equipment. Therefore, we conclude that there was no variance. Moreover, even if a variance did exist, it did not surprise and could not have prejudiced National. Consequently, any such variance could not be relied upon by the trial court to set aside Graves' jury verdict.

## II.

■ We turn now to the question of what evidence a trial court must consider in ruling on a motion to set aside a verdict. It appears that this exact issue has never been ruled on by the Court. However, we have, over the years, in a multitude of cases, accepted the proposition that on a motion to set aside a verdict the trial court is to consider *all* the evidence. For example, in *Ricketts v. J. G. McCrory Co.,* 138 Va. 548, 560, 121 S.E. 916, 920 (1924), we discussed the standard to be applied in setting aside a verdict and went on to state that the trial court

> must be satisfied from the evidence adduced either that there was no evidence to support the verdict, or that the verdict was plainly contrary to the evidence. *This conclusion must be drawn from the whole evidence in the case. . . .*

(Emphasis added; citations omitted.) *See Matney* v. *Cedar Land Farms,* 216 Va. 932, 224 S.E.2d 162 (1976); *Braxton* v. *Flippo,* 183 Va. 839, 33 S.E.2d 757 (1945). In essence, the instant appeal gives us the opportunity to confirm that which has always been the practice in our courts; we welcome this opportunity.

The reason for the rule that a trial court, when considering a motion to set aside a verdict, must consider all the evidence is simple and straightforward: the trial court, in ruling on such a motion, must place itself in the jury's shoes. It must see what the jury saw so that it can decide whether *any* credible evidence exists to support the jury's verdict. It should be self-evident that once the jury has seen all the evidence a court, called on to test the propriety of the jury's verdict, cannot do so on less than all the evidence. Thus, on a motion to set aside a jury verdict the trial court is required to consider all the evidence.

## III.

■ In keeping with our discussion in the preceding section, if we find any credible evidence in the record that supports the jury verdict, then that verdict must be reinstated and judgment entered thereon. *Baird* v. *Dodson Bros. Exterminating,* 217 Va. 745, 232 S.E.2d 770 (1977). Moreover, in analyzing the evidence, even though the trial court set aside the jury verdict, we are nevertheless required to give plaintiff "the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn there-

from." *Matney,* 216 Va. at 934, 224 S.E.2d at 163 (quoting *Walton v. Walton,* 168 Va. 418, 423, 191 S.E. 768, 770 (1937)).

It is undisputed that the insulation fell from the ceiling and walls of the St. Christopher's gym because it did not contain enough glue to hold it in place. However, that evidence, by itself, neither proves negligence nor establishes liability on the part of National. To prove negligence and establish liability, Graves was required to show that some act or omission on the part of National proximately caused the lack of glue. In this regard, Graves contended that National, through its agent, Marvin Giffin, negligently applied the insulation. As we have seen, in the context of this case, "applied" did not mean the final act of spraying the insulation on the ceilings and walls at the gym. Instead, it meant the entire process from setting up the equipment, to adjusting the pressure of the glue and the rate of flow of the fiber, to spraying the mixture on the ceiling and walls. Graves' contention is that National, through Giffin, in setting up the equipment, engaged in conduct that fell below the standard of care of a reasonably prudent technician in National's Application Department, which conduct led to an insufficient amount of glue and ultimately resulted in the insulation's falling from where it had been sprayed.

The following facts emerge from a consideration of all the evidence: the scope of the St. Christopher's job was too great for Weiler because Weiler had only one employee with any training in the application of K-13 insulation. Weiler requested assistance from National. National responded by sending to Richmond Marvin Giffin, who had, at the time, more than seven year's experience in applying spray-on insulation, who had traveled to foreign countries on behalf of National overseeing the application of K-13, and who was described as a "technician in the [National] Application Department." Giffin worked on the project in Richmond approximately one week. His first activity was to repair the blowing equipment, which had electrical problems that resulted in its blowing fuses. Next, Giffin helped the Weiler employees set up the equipment at St. Christopher's. The fiber-blowing machine was on a low setting and Giffin recommended that, because of the inexperience of the Weiler crew, that setting be maintained. Apparently, Giffin was of the view that an inexperienced crew could better handle the blowing equipment if it were set on a low setting than if it were set on a medium or high setting. Weiler agreed with

Giffin's recommendation to keep the blowing machine on a low setting.

Once the equipment was set up, Giffin tested it. There exists a conflict in the evidence concerning the nature of the tests conducted by Giffin on the equipment. Giffin said he conducted several tests for more than one hour to determine the rate of flow of the fiber and the proper pressure for the glue. Giffin says he followed the tests called for in the application manual. However, Graves' witness, William Murphey, disputed Giffin's testimony. According to Murphey, all Giffin did was a "sight check." Murphey said Giffin merely turned on the equipment and "looked at it." Murphey testified that Giffin then said the insulating material coming out of the nozzles "looked good to him." On this appeal we are bound to conclude that the jury believed Murphey's testimony that Giffin did nothing but make a "sight check."

Giffin set the controls on the equipment as he deemed appropriate and instructed Weiler's men not to change those settings. Other evidence established that Giffin's settings were, in fact, never altered, even after Giffin left the jobsite. Once Giffin made his settings, the workers did nothing more than periodically change the spray nozzle on the glue gun when it became clogged. The periodic changes were necessary to maintain a proper flow of glue but did not alter Giffin's basic settings on the equipment. Once the settings were made by Giffin he taught Weiler's men how to spray and actually did some spraying himself.

In addition to testimonial evidence, plaintiff introduced two answers to interrogatories from National. In the first interrogatory, Graves asked National to state the proper ratio of glue to fiber in K-13 insulation. National responded as follows: ".051 gallons of adhesive to one pound of fiber." In the second interrogatory, Graves asked National what was done by its representative on the St. Christopher's job to assure the proper mixture of the K-13 product. National responded as follows: "Nothing specifically was done for this job. All K-13 is applied with standard procedures as outlined in our application manuals."

Thereafter, additional evidence was adduced in National's case. Giffin admitted that on the St. Christopher's job it was his responsibility "to train the crew, to see that the equipment functioned in all respects of pressure involved in every type of application." He further admitted checking "the machinery out" at the jobsite to "see that it was functioning properly."

Giffin had recommended that Weiler leave the blowing machine on a low setting and had received Weiler's concurrence in that recommendation. But Giffin testified that although the blowing equipment was set on low when he found it, he "changed it from the low speed to the medium speed." He went on to testify that at the medium speed fiber was blown out of the blowing machine at a rate of 288 pounds per hour.

Giffin said that once he determined the rate of fiber flow he consulted a chart in the Application Manual to determine the proper nozzle pressure for the glue. He found that number to be 78 psi. He said he set the actual nozzle pressure at 80 psi, which, in his opinion, would not be harmful because it made more glue flow into the fixture than the minimum amount required by the chart.

Giffin also testified that in addition to the nozzle pressure the glue machine had a setting for "pump pressure." He set the pump pressure at 200 psi though he did not explain how he arrived at that figure.

In a memorandum handwritten by Giffin near the time of the St. Christopher's project, he noted the following information: "pump pressure 200," "nozzle [pressure] 80 pd," "RPM 16 — 288 pd per hr." The memorandum was admitted into evidence as Defendant's Exhibit 2.

In Section II of the Application Manual, which was also a defendant's exhibit, at pages 5 and 6 of 18, the rate of flow of fiber where the blowing machine is set on low or medium speed is stated in the following terms:

> *Low Speed* is used in fine finish work; average pound fiber per machine hour — 250-270.
>
> *Medium Speed* is used in most K-13 applications. The feed rate at medium speed allows good control of the spray while keeping production footage up. Medium speed is normally used on overhead work. The spray man's capabilities will, of course, have to be taken into consideration. Average delivery in pounds of fiber per machine hour — 350-360.

There exists a substantial discrepancy between the equipment settings testified to by Giffin and the results he said he obtained from those settings. This discrepancy could have led the jury to believe that Giffin set up the equipment incorrectly. Giffin testified

unequivocally that, acting alone, he changed the speed of the blowing machine from low to medium. He then testified that once the blowing machine was set on medium speed he determined the rate of flow of fiber to be 288 pounds per hour. The Application Manual shows he was mistaken. According to the manual, when the blowing machine is set on medium the rate of flow of fiber is 350 to 360 pounds per hour. It is only when the blowing machine is set on low speed that the rate of flow of the fiber is close to 288 pounds per hour. Giffin went on to testify that he made the settings for the glue on the basis of 288 pounds of fiber per hour. Because his fiber flow figure was incorrect, his glue pressure was likewise incorrect. As a result, the glue was sufficient to mix with 288 pounds of fiber per hour but was obviously insufficient to mix with 350 to 360 pounds of fiber per hour. In short, based on Giffin's testimony about his adjustments to the equipment, it is no surprise that the insulation did not contain enough glue to hold it in place.

Based on all the evidence, the jury was entitled to believe that National's highly touted expert set up and tested the equipment not by the manual but by sight; that he changed the setting on the blowing machine from low to medium and that because he did not make the tests called for by the Application Manual he did not discover the true rate of flow of the fiber; that, in light of National's answers to interrogatories, it was not proper for Giffin to use a sight test in lieu of procedures set forth in the manual; that he adjusted the glue pressure on the basis of erroneous information concerning the fiber flow; that once he made his settings they were never changed; and that, as a result, throughout the entire job, the amount of glue was insufficient for the amount of fiber leading to the subsequent problem of falling insulation. We think that there is more than enough credible evidence to support the jury verdict in this case.

## IV.

For all the foregoing reasons we will reverse the decision of the trial court, reinstate the jury verdict, and enter final judgment for plaintiff on the jury's verdict.

*Reversed and final judgment.*