## CIRCUIT COURT OF PAGE COUNTY

Addie Breeden

 v.

George L. Baughan et al.

June 20, 1984

Case No. (Law) 5738

By JUDGE JOSHUA L. ROBINSON

 In this common law master-servant case, the defendants' motion to set aside the verdict of the jury awarding the plaintiff damages for personal injury tests the sufficiency of the evidence to support the verdict; the verdict having resolved the issues of contributory negligence and assumption of risk favorably to the plaintiff, the Court need not consider these issues, but under well established principles of tort law, has no alternative but to grant the motion.

 The standard to be applied is well settled. The trial court must be satisfied from the evidence adduced either that there was no evidence to support the verdict, or that the verdict was plainly contrary to the evidence. This conclusion must be drawn from the whole evidence in the case. The Court must decide whether *any* credible evidence exists to support the jury's verdict. In analyzing the evidence, the trial Court must give the plaintiff the benefit of all substantial conflict in the evidence and all fair inferences that may be drawn therefrom in the light most favorable to the plaintiff. *T. M. Graves Construction, Inc.* v. *National Cellulose Corp.*, 226 Va. 164, 169 (1983).

 The plaintiff was a lady of mature years and had been employed by the defendants as a household domestic for some time. We describe the circumstances in her language:

"Q. Okay. Addie, prior to 1981 what type of work did you do?

A. Well, I could do anything before I had the accident. I was a very active person. I could do most anything. I had mostly housework a few years before I got hurt, but I have worked in chicken plants and sewing plants and things like that.

Q. What happened in the summer of 1981?

A. Well, I went to work for Mrs. Baughan. I think that was June 22, 21st or 22nd. And I worked for her and her daughter-in-law off and on, they'd switch me from house to house. On August the 5th I was washing the windows and I fell off the radiator. . . .

Q. When you went to work what type of work were you doing?

A. Well, most everything, I mean around the house, like ironing, washing, washing windows, scrubbing, cleaning; just everything, just like a house maid. I mean, I was doing it all.

Q. And prior to August 5th what work had you been doing, what were your assignments then? . . .

Q. Well, when you got there who told you what to do?

A. Mrs. Baughan.

Q. Did she tell you how to do it?

A. Well, she usually let me use my own judgment, I think. She would tell me some things to do and how she wanted it done, but she didn't tell me too much about how you do it. She was a very good person to work for. . . .

Q. And what did you do up there. Well, let me withdraw that. What were you told to do up there?

A. Well, she told me downstairs that she wanted me to do the windows in the bedroom that day. And she gave me some paper towels and the Windex, or I'm not sure it was Windex; it was a liquid. And she gave me that and we went upstairs and she showed me what she wanted me to do and she told me.

Q. What did she show you?

A. She showed me the windows and told me that she wanted me to clean them inside and out. I did what I could do there. I was pretty subtle (sic) at that time and I just got on the radiator and did it.

Q. Was she there when you got on the radiator?

A. No, she wasn't there when I got on it, but she come in and saw me on it. She told me I'd have to stand on the radiator to get--she brought a yardstick in later and told me I'd have to push the curtains back straight with the yardstick.

Q. Did she say anything about the radiator?

A. Well, nothing but other than I'd have to stand on it because it was right in front of the window. . .

A. They didn't tell me how to clean it. She just told me that she wanted it cleaned. She didn't tell me anything like that. The only thing she said, I'd have to push that curtain back and do the windows. They're the kind of windows that have the ropes in, you can pull them down. . . .

Q. Now, what happened on the radiator that day?

A. Well, I had cleaned the window and I went to turn to get back down. And when I did I got overbalanced and I put my left foot out to break the fall. And when I did my knee buckled. It was kind of like a sting in my knee, kind of like a bee sting in my knee. And I went down and I kind of went backwards."

We find no other evidence in the record, and counsel has pointed to none, to explain what caused the plaintiff to get "overbalanced" and fall from the radiator. Although the plaintiff introduced no evidence showing a precise description of the radiator, it is shown in defendants' Exhibits A, B, C, D, E, and F. There was no evidence of any latent defect therein that might have caused the plaintiff to fall, and no evidence with respect to the condition of the radiator that was known to the defendants, but was not apparent to the plaintiff from casual observation. If the yardstick were a tool or appliance, there was no evidence of any defect or condition thereof that contributed to the plaintiff's fall. If the radiator were an unsafe work place, there was no evidence of any condition thereof that was defective or that posed any special danger that might have been known to the defendants, when the plaintiff was in, at least, as good a position, if not better, to evaluate the circumstances in the light of the plaintiff's agility and her physical capacity to do the work that she had done many times before.

This case is governed by the recent decision of our Supreme Court in *Tate v. Rice*, 227 Va. 341 (1984). We are here concerned solely with the question whether there

was evidence of primary negligence on the defendants' part. The resolution of the question is governed by the language of the Supreme Court in *Tate* v. *Rice, supra* 227 Va. at 345:

> an owner · or occupier must use ordinary care to keep his premises reasonably safe for an invitee, although he is not an insurer of the invitee's safety. An invitee has a right to assume that the premises are reasonably safe for his lawful use, in the absence of information to the contrary. While the owner must give notice or warning of an unsafe condition which is known to him and unknown to the invitee, such notice is not required where the dangerous condition is open and obvious, and is patent to a reasonable person exercising ordinary care for his own safety. *Culpeper* v. *Neff*; 204 Va. 800, 804-05, 134 S.E.2d 315, 318-19 (1964); *Gall* v. *Tea Company*, 202 Va. 835, 837, 120 S.E.2d 378, 380 (1961); *Gottlieb* v. *Andrus*, 200 Va. 114, 117, 104 S.E.2d 743, 746 (1958); *Knight* v. *Moore*, 179 Va. 139, 145-46, 18 S.E.2d 266, 269 (1942). "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he. . . (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it." Restatement (Second) of Torts § 343 (1965).
>
> "(I)n the usual case, there is no obligation to protect the invitee against dangers which are known to him, or which are so obvious and apparent to him that he may reasonably be expected to discover them. Against such conditions it may normally be expected that the visitor will protect himself." W. Prosser, *Handbook of the Law of Torts*, Section 61 (4th ed. 1971).
>
> "The knowledge of the condition removes the sting of unreasonableness from any danger that lies in it, and obviousness may be relied on to supply knowledge. Hence the obvious character of the condition is incompatible with negligence in maintaining it. If the plaintiff happens to be hurt by the condition, he is barred from

recovery by lack of defendants' negligence toward him, no matter how careful plaintiff himself may have been." 2 Harper & James, *Law of Torts*, Section 27.13 at 1491 (1956).

Thus, the obviousness of the danger serves to eliminate any duty on the landowner's part to warn of or to remove the danger.

Paraphrasing the language of Mr. Justice Russell at 227 Va. 346, in the case before the Court the conditions of the radiator were as obvious to the plaintiff as they were to the defendants. There was no evidence of any latent or hidden condition known to the owners but not apparent to the plaintiff. Thus, under the familiar tort principles discussed above, the evidence fell short of demonstrating primary negligence on the defendants' part.