Present: All the Justices

GALLOWAY CORPORATION

v.  Record No. 942077

S.B. BALLARD CONSTRUCTION CO., ET AL.

OPINION BY JUSTICE LAWRENCE L. KOONTZ, JR.
November 3, 1995

GALLOWAY CORPORATION

v.  Record No. 950529

CAPE HENRY MECHANICAL, INC., ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
John E. Clarkson, Judge

This appeal arises from a contract dispute between a general contractor and several of its subcontractors on a construction project following the project owner's default in making payment on its contract with the general contractor.  The issue we consider is whether the terms of the subcontracts provide the general contractor an absolute "pay when paid" defense to its subcontractors' breach of contract claims based upon the owner's failure to pay.  Stated differently, the issue we consider is whether the terms of the subcontracts in question shift the risk of the owner's default on payment for labor and materials from the general contractor to the subcontractors.

I.
BACKGROUND

On August 17, 1988, Galloway Corporation (Galloway), a construction contractor, entered into a contract with Rowe Properties – Bank Street Limited Partnership (Rowe) for the construction of the First American Financial Center, a fourteen-story commercial office complex in downtown Norfolk.  Rowe and

Galloway used a standard, pre-printed American Institute of Architects (AIA) contract with attachments to form the basis of their agreement. The stated contract price was $10,960,000. Within the general conditions of the contract was the following requirement:

The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's Work, the amount to which said Subcontractor is entitled . . . .

Galloway immediately commenced work on the construction project and let subcontracts to numerous suppliers of labor and materials. Galloway also used a standard, pre-printed AIA form in letting these subcontracts. Separate paragraphs of the subcontract form specify the manner in which progress payments and final payment will be made by Galloway to the subcontractor.

Paragraph 11.3 contains the following pertinent language:

The Contractor shall pay the Subcontractor each progress payment within three working days <u>after the Contractor receives payment from the Owner</u>. If the Architect does not issue a Certificate of Payment or the Contractor does not receive payment for any cause which is not the fault of the Subcontractor, the Contractor shall pay the Subcontractor, on demand, a progress payment computed as provided in Paragraphs 11.7 and 11.8.

(Emphasis added.) In each contract, Galloway struck out all the language following the word "Owner", initialed the change and requested that the subcontractor initial the change.

Paragraph 12.1, entitled "Final Payment," contains the following pertinent language:

Final payment, constituting the entire unpaid balance of the Subcontract Sum, shall be made by the Contractor to the Subcontractor when the Subcontractor's Work is fully performed in accordance

with the requirements of the Contract Documents, the Architect has issued a Certificate of Payment covering the Subcontractor's completed Work <u>and the Contractor has received payment from the Owner</u>.  If, for any cause which is not the fault of the Subcontractor, a Certificate for Payment is not issued or the Contractor does not receive timely payment or does not pay the subcontractor within three working days after receipt of payment from the Owner, final payment to the Subcontractor shall be made upon demand.

(Emphasis added.[*])  Again, in each contract, Galloway struck out all the language following the word "Owner", initialed the change and requested that the subcontractor initial the change.

Work on the project continued from August 1988 until May 1990 when Rowe, suffering severe financial difficulties, stopped making progress payments to Galloway.  On May 31, 1990, Galloway informed Rowe and the architect that it would stop work on the project and notified its subcontractors to secure their tools, equipment, and materials on the job site in anticipation of work being stopped.  Work actually continued until July 17, 1990, when Galloway terminated its contract with Rowe.  At that time Rowe had failed to make three progress payments to Galloway totaling slightly less that $3,000,000.

On September 20, 1990, Galloway filed a bill of complaint against Rowe to enforce its mechanic's liens.  S.B. Ballard Construction Company (Ballard), Sprinkle Masonry, Inc. (Sprinkle), Empire Granite Corporation (Empire), Cape Henry Mechanical Corporation (Cape Henry), and Dover Elevator Company

---

[*]The phrase "after the Contractor receives payment from the Owner" in paragraph 11.3, <u>supra</u>, and the phrase "and the Contractor has received payment from the Owner" in paragraph 12.1 form the basis of Galloway's "pay when paid" defense discussed later in this opinion.

(Dover), subcontractors on the project, filed individual bills or cross-bills against Rowe and Galloway for their mechanic's liens and sought damages from Galloway for breach of contract. The trial court consolidated all these claims into the suit filed by Galloway against Rowe.

In a January 13, 1992 pre-trial order, the parties outlined the issues and stipulated to various elements of the evidence. Galloway asserted that the modification of the AIA contract form used in the subcontracts provided it with a "pay when paid" defense. That is, that the phrases "after the Contractor receives payment from the Owner" and "has received payment from the Owner," in paragraphs 11.3 and 12.1, respectively, create a condition precedent that Galloway must first receive payment from Rowe before being required to make payment under the subcontracts. Some, though not all, of the subcontractors agreed that if their contracts provided Galloway with a "pay when paid" defense, their sole course of recovery was against Rowe through their mechanic's liens. Also within the stipulations were agreements between Galloway and the various subcontractors that parol and other extrinsic evidence could be produced on the "pay when paid" issue.

Testimony was received over six weeks. Following the conclusion of the evidence and argument of counsel, the trial court determined the validity, priority, and amount of the mechanic's liens plus interest and approved the sale of the property, deferring the satisfaction of the mechanic's liens until after the completion of the sale. The trial court delayed

further proceedings on the breach of contract claims until after the conclusion of the sale.

Following the sale and division of the proceeds, the subcontractors, whose liens had precedence over Galloway's, sought to recover the remaining unpaid balances due under their contracts with Galloway. On January 21, 1994, the trial court, by letter to counsel, stated its finding that there remained unpaid balances on the contracts and that Galloway did not have an absolute "pay when paid" defense based on the contracts as written. Rather, the trial court found that the phrases "after the Contractor receives payment from the Owner" and "has received payment from the Owner" only permitted Galloway to "delay payment[,] but the contract[s] cannot be construed to say that each sub[contractor] must bear its own loss if Galloway never got paid [on its contract with the owner]."

Galloway filed a motion for reconsideration, which was denied. Thereafter, the trial court entered final orders directing judgment for the subcontractors and awarding them the balance of their unpaid contracts plus interest. We awarded Galloway an appeal to consider the question of the "pay when paid" defense.

## II.
## THE "PAY WHEN PAID" DEFENSE

This appeal presents our first opportunity to consider the use of "pay when paid" (sometimes rendered as "paid when paid") clauses in construction contracts. The use of such clauses rose significantly in the 1980s because economic conditions made

successful completion of private construction projects more difficult and engendered a cautious attitude throughout the construction industry. See generally, Francis J. Mootz, III, The Enforceability of Paid When Paid Clauses in Construction Contracts, 64 Conn. B.J. 257 (1990).

The leading case to address the enforceability of "pay when paid" clauses is Thos. J. Dyer Co. v. Bishop International Engineering Co., 303 F.2d 655 (6th Cir. 1962). In Dyer, the contract provided that "no part of [the price to be paid to the subcontractor] shall be due until five (5) days after Owner shall have paid Contractor therefor." Id. at 656. Following the insolvency of the owner, a subcontractor sought to enforce its contract with the general contractor. The Sixth Circuit rejected the general contractor's argument that the language of the contract constituted a condition precedent giving it a defense to the breach of contract claim. The court explained its rationale in the following language:

> In the case before us we see no reason why the usual credit risk of the owner's insolvency assumed by the general contractor should be transferred from the general contractor to the subcontractor. It seems clear to us under the facts of this case that it was the intention of the parties that the subcontractor would be paid by the general contractor for the labor and materials put into the project. We believe that to be the normal construction of the relationship between the parties. If such was not the intention of the parties it could have been so expressed in unequivocal terms dealing with the possible insolvency of the owner. North American Graphite Corp. v. Allan, 87 U.S. App. D.C. 154, 184 F.2d 387, 390. Paragraph 3 of the subcontract does not refer to the possible insolvency of the owner. On the other hand, it deals with the amount, time, and method of payment, which are essential provisions in every construction contract, without regard to possible insolvency. In our opinion, paragraph 3 of the subcontract is a reasonable

provision designed to postpone payment for a reasonable period of time after the work was completed, during which the general contractor would be afforded the opportunity of procuring from the owner the funds necessary to pay the subcontractor.  Stewart v. Herron, 77 Ohio St. 130, [146,] 82 N.E. 956 [,959].  To construe it as requiring the subcontractor to wait to be paid for an indefinite period of time until the general contractor has been paid by the owner, which may never occur, is to give to it an unreasonable construction which the parties did not intend at the time the subcontract was entered into.

Id. at 661.

The contract in Dyer further provided that 90 percent of the payment was due in any case 35 days after completion of the work.  Id. at 656.  The court construed this provision of the contract together with the term relied on by the general contractor as merely postponing the time of payment to the subcontractor on an unconditional promise to pay until payment by the owner, "or for a reasonable period of time if it develops that such event does not take place."  Id. at 659.  The court premised its result on the fact that it is the general contractor who contracts with the owner.  Id. at 660.  The court further held that the credit risk inherent in the general contractor's undertaking may be shifted to the subcontractor, but in order to do so, "the contract between the general contractor and subcontractor should contain an express condition clearly showing that to be the intention of the parties."  Id. at 661

Since the Dyer decision, the majority of jurisdictions which have considered the "pay when paid" defense have adopted the reasoning of the Sixth Circuit.  See Mootz, Enforceability, 64 Conn. B.J. at 263 and cases cited therein at n.17; see also

Gilbane Building Co. v. Brisk Waterproofing Co., Inc., 585 A.2d 248, 250 (Md. Ct. Spec. App. 1991) (holding that use of term "condition precedent" in "pay when paid" clause clearly establishes intent of parties to shift credit risk of owner's insolvency to subcontractor). A minority of jurisdictions as a matter of policy do not allow the risk of owner insolvency to be shifted from the general contractor to the subcontractors. See, e.g., N.C. Gen. Stat. § 22C-2 (1994).

We find the reasoning of the Dyer decision to be sound and in concert with traditional notions of the freedom to contract. See Worrie v. Boze, 191 Va. 916, 928, 62 S.E.2d 876, 882 (1951). However, that reasoning is applicable only where the language of the contract in question is clear on its face. If, as in Dyer, a contract on its face reasonably contemplates eventual payment by the general contractor to the subcontractor, or, as in Gilbane, the parties clearly intend there to be a condition precedent fulfilled before payment comes due, the contract will be construed as written and will not be reformed by the court through the introduction of parol and other extrinsic evidence of a contrary intent. Accordingly, we must consider whether the contracts sub judice are clear on their face as to the parties' intent.

### III.

### CONSTRUCTION OF THE CONTRACTS

Although the parties stipulated that parol and other extrinsic evidence could be adduced as to the meaning of the disputed parts of the contracts, neither the trial court, nor

this Court, is thereby precluded from examining the contracts first, following the usual rules of contract construction.  See Whitt v. Godwin, 205 Va. 797, 802, 139 S.E.2d 841, 845 (1965).  The mere fact that terms of a contract are in dispute is not evidence that the language is not clear and explicit and requires extrinsic evidence to aid in its construction.  If the terms of the parties' agreement are contained in a clear and explicit writing, that writing is the sole memorial of the contract and the sole evidence of the agreement.  In that event, parol evidence cannot be used to explain the written contractual terms.  See Amos v. Coffey, 228 Va. 88, 91-92, 320 S.E.2d 335, 337 (1984).

Similarly, "parol evidence cannot be considered to explain a patent ambiguity, that is, to supply the understanding that the parties could have reasonably been expected to reach where the language of an instrument reflects no understanding."  Zehler v. E.L. Bruce Co., Inc., 208 Va. 796, 799, 160 S.E.2d 786, 789 (1968);  see also City of Roanoke v. Blair, 107 Va. 639, 641, 60 S.E. 75, 76 (1908).  Only where the ambiguity is not self-evident from the writing, that is, where there is a "latent ambiguity," is the use of parol and other extrinsic evidence permissible to aid the trier of fact in determining the intention of the parties.  Portsmouth Gas Co. v. Shebar, 209 Va. 250, 253, 163 S.E.2d 205, 208 (1968).

"An ambiguity exists when language is of doubtful import, admits of being understood in more than one way, admits of two or more meanings, or refers to two or more things at the same time."

Allen v. Green, 229 Va. 588, 592, 331 S.E.2d 472, 475 (1985); see also Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner, 225 Va. 508, 515, 303 S.E.2d 894, 898 (1983). Ambiguity is created by the "[d]oubtfulness [or] doubleness of meaning . . . of an expression used in a written instrument." Berry v. Klinger, 225 Va. 201, 207, 300 S.E.2d 792, 796 (1983).

Here, as in Dyer, the terms in paragraphs 11.3 and 12.1, respectively, deal with the amount, time, and method of payment to the subcontractor by the contractor, without regard to possible insolvency of the owner. As such, they are essential provisions in any construction subcontract. Unlike the facts in Dyer, however, there is no additional language here which would permit us to find that the parties contemplated payment "within a reasonable time." Likewise, nothing in the contracts would permit us to find, as in Gilbane, that the parties clearly understood these terms to assert a condition precedent on payment. Moreover, the contracts are completely devoid of any unequivocal terms dealing with the possible insolvency of Rowe to show that the subcontractors assumed the risk of that insolvency. Thus, the language of the contracts is not patently ambiguous; the latent ambiguity in the contracts was exposed only after the default of the owner brought the issue into focus.

Thus, we conclude that the phrases "after the Contractor receives payment from the Owner" and "has received payment from the Owner" constitute latent ambiguities in the contracts. That is, the phrases, while appearing perfectly clear at the time the contracts were formed, because of subsequently discovered or

developed facts, may reasonably be interpreted in either of two ways.  See Zehler, 208 Va. at 799 n.5, 160 S.E.2d at 789 n.5. Here, the contracts in question could be interpreted to require Galloway to pay a subcontractor only if it received a payment demanded from Rowe identifiable with the progress or completion of a subcontract, or merely to provide for a reasonable time to pay after such demand was made to Rowe.  Because this ambiguity was not patently evident on the face of the contract, the trial court was permitted to look beyond the contract and determine the intent of the parties using parol and other extrinsic evidence.

## IV.
## CONSIDERATION OF INDIVIDUAL CONTRACTS

When resolving a dispute between the parties to a contract with a latent ambiguity, the court may first consider, among other things, whether negotiations and prior dealings of the parties manifested their intent with respect to the ambiguous term.  If the parties both manifested the same intent with respect to the ambiguity, that intent will be enforced.  If, on the other hand, the parties do not manifest the same intent regarding the ambiguity, there has been no meeting of the minds on that term of the contract, and the intent of one party will not control.  It is apparent from the record of this case that Galloway intended, in each case, that the contract would provide it with an absolute "pay when paid" defense.  Thus, only if the subcontractor to each contract manifested the same intent will an absolute "pay when paid" defense be available to Galloway.

### Ballard Construction

Ballard's president, Steven B. Ballard, testified that he had previous experience with "pay when paid" clauses and that he had "been educated the hard way" as to their effect. He further testified that he was aware that Galloway had altered the AIA form contract, but that he was depending on a separate "scope of work" agreement, that pre-dated the contract, which included a discount "to expedite the payment from the contractor to [Ballard] without worrying about the payment from the owner to the contractor." Under that agreement, before and after signing the contract, Ballard received twelve progress payments from Galloway without Galloway first receiving a payment from Rowe identifiable to the work performed by Ballard. Based upon this evidence, the trial court properly construed the contract to permit Galloway only a reasonable amount of time in which to make progress and final payments to Ballard. Accordingly, we will affirm the trial court's award to Ballard.

### Dover Elevator

After receiving the contract as modified by Galloway, Dover submitted an amendment which modified Article 12 to require "final" payment within 30 days of certain conditions being fulfilled by Dover. Dover was to receive payment if Rowe accepted the installation of the elevator cabs provided by Dover or if Rowe accepted the completion of the project in whole including acceptance of the elevator installation. Paul A. Galloway, Galloway's president, testified that neither of these conditions had occurred prior to Rowe's default. He further testified that he understood this to be a modification of the

"pay when paid" clauses to eliminate the defense only in the event of one of the two conditions occurring. Although Dover presented evidence from its local manager, the manager conceded that he had no knowledge of the negotiations between Dover and Galloway.

Because Dover was in the position of having made the final offer, and thus technically having control over the drafting of the contract, we are required to construe the contract in favor of Galloway. See Baird v. Dodson Bros. Exterminating, 217 Va. 745, 749, 232 S.E.2d 770, 773 (1977); Graham v. Commonwealth, 206 Va. 431, 434-35, 143 S.E.2d 831, 834 (1965). Moreover, Dover's modification of Article 12 would indicate an understanding of the effect of Galloway's prior modification of paragraph 12.1, and, by extension, the identical modification of paragraph 11.3. Accordingly, we hold that the evidence adequately supports Galloway's contention that the parties had the intent of providing a "pay when paid" defense in circumstances other than those covered by the amendment to Article 12. The trial court's award to Dover for breach of contract was thus in error and will be reversed.

### Cape Henry Mechanical, Empire Granite, and Sprinkle Masonry

William A. Etheridge, Jr., Cape Henry's president, testified that he understood that Galloway's intent in altering the AIA contract was "to not be obligated to pay [Cape Henry] until [Galloway] got paid." (Emphasis added.) Etheridge further conceded that subcontractors did not favor such terms, but that he understood that he had to accept "pay when paid" terms in

order to be awarded the subcontract.

Apparently through an oversight, Stephen C. Broocks, Empire's president, failed to sign the final contract proposed by Galloway. As Empire undertook to perform the contract according to its terms, an acceptance by performance resulted. The absence of an authorized signature does not defeat the existence of the contract and does not impact our analysis of the parties' awareness of and intention concerning the ambiguity.

Broocks testified that he "thought the language . . . as drafted . . . [meant that] if something should go wrong with the job it would make it hard to get my money." He further testified that he understood "Empire [would not] get paid until Galloway [was] paid." (Emphasis added.)

Robert Hedrick, Sprinkle's vice-president, testified that his "understanding of this contract . . . is that when [Galloway] received payment from the owner [Sprinkle] would receive [payment from Galloway]." He further testified that being familiar with Galloway and its relationship with Rowe, Sprinkle assented to these terms without concern that Rowe would not be able to fulfill its contract with Galloway.

The testimony of the representatives of these subcontractors shows that, even though the terms of their contracts were legally ambiguous, each had a mutuality of understanding with Galloway in regard to the ambiguous terms. A plaintiff's case can rise no higher than his own testimony. Massie v. Firmstone, 134 Va. 450, 462, 114 S.E. 652, 655-56 (1922). Accordingly, since the evidence shows that the parties, by their negotiations and prior

dealings, understood and intended their contracts to give Galloway an absolute "pay when paid" defense, the trial court's awards for breach of contract to these subcontractors were in error and will be reversed.

In summary, we hold that in the absence of a clear and unambiguous statement of the parties' intent as to the meaning of the time of payment provision in a construction subcontract, an absolute "pay when paid" defense is available to a general contractor only if it can establish by parol evidence that the parties mutually intended the contract to create such a defense. Here, the evidence shows that such a defense was contemplated by each of the subcontractors and was agreed to by each subcontractor with the exception of Ballard. With respect to Ballard, the evidence shows express efforts to avoid such a defense. Accordingly, we will affirm the award to Ballard for breach of contract and will reverse the awards to Dover Elevator, Cape Henry Mechanical, Empire Granite, and Sprinkle Masonry.

Record No. 942077 – <u>Affirmed in part,
reversed in part,
and final judgment.</u>

Record No. 950529 – <u>Reversed and final judgment.</u>