LANE CONSTRUCTION CORP., Plaintiff,

v.

BROWN & ROOT, INC., Defendant.

Moore Brothers Company, Inc., Plaintiff,

v.

Brown & Root, Inc., Defendant.

Nos. 1:96CV1809, 1:96CV1810.

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 30, 1998.

708

completion bonus in connection with the construction of the Dulles Toll Road Extension Highway ("DTRE"). Set forth here, pursuant to Rule 52, Fed.R.Civ.P., are the Court's findings of fact and conclusions of law, beginning appropriately with the jurisdictional facts and a description of the parties, other relevant entities, and witnesses.

## I. FINDINGS OF FACT

### A. Parties and Witnesses

1. Plaintiff Moore Brothers Company, Inc. ("Moore") is a Virginia corporation with its principal place of business in Verona, Virginia. At all relevant times, Moore was a subcontractor engaged in the construction of the DTRE.

2. Plaintiff Lane Construction Corporation ("Lane") is a Connecticut corporation with its principal place of business in Marigon, Connecticut. At all relevant times, Lane was a subcontractor engaged in the construction of the DTRE.

3. Defendant Brown & Root, Inc. ("Brown & Root") is a Delaware corporation with its principal place of business in Houston, Texas. At all relevant times, Brown & Root was the general contractor engaged in the construction of the DTRE.

4. Highlands Insurance Company ("Highlands") is a Texas corporation with its principal place of business in Houston, Texas. Highlands is the bond surety for Brown & Root on the DTRE project.

5. Toll Road Investors Partnership II, L.P. ("TRIP") is a limited partnership that owns the DTRE. TRIP's two general partners are (i) Shenandoah Greenway Corporation, a closely held corporation owned by the Bryant family and (ii) Autostrade International, Ltd., the American subsidiary of an Italian toll road company. Brown & Root Toll Road Investors, Inc. is a limited partner of TRIP.[1]

Raymond J. Diaz, Robert E. Scully, Jr., Joseph F. Jackson, Rees, Broome & Diaz, Vienna, VA, for Moore Bros. Co., Inc. and Lane Const. Corp.

Charles L. Shumate, Daniel J. Kraftson, Shumate, Kraftson & Sparrow, P.C., Reston, VA, Thomas M. Brownell, Shauna M. Wertheim, Roberts & Brownell, LLC, Vienna, VA, for Brown & Root, Inc.

## Findings of Fact and Conclusions of Law

ELLIS, District Judge.

In these consolidated diversity breach of contract, fraud, and unjust enrichment actions, two subcontractors seek recovery from the general contractor for (i) changes in the scope of work and (ii) non-payment of early

1. The parties here also participated in an arbitration process arising out of many of the same claims and facts at issue here. The alignment of the parties in that proceeding differed from the parties' alignment here: there, Brown & Root and the two subcontractors, Moore and Lane, were not adversaries, but were aligned together to seek payment from the owners for the work orders resulting from the changes in scope and for the contractor bonus. The proceeding was conducted in phases, and resulted on April 16, 1996 in the issuance of an arbitration award to Brown & Root and the subcontractors, which award was reduced slightly in a later supplemental arbitration report.

6. At trial the parties presented a total of 17 witnesses in person or by deposition. A brief description of each witness follows:

(a) W.F. Sibert, Moore's Executive Vice President, supervised Moore's work on the DTRE, including the construction work, contract negotiation and claims resolution;

(b) E.M. Wheeler, Lane's recently retired Vice President—Construction, supervised Lane's work on the DTRE, including construction work, contract negotiations and claims resolution;

(c) Charles E. Williams, TRIP's Chief Operating Officer, as the responsible senior TRIP official, negotiated the construction contract between TRIP and Brown & Root and managed the construction process for TRIP;

(d) Michael Crane is the Chief Executive Officer of TRIP;

(e) Frank J. Baltz, a partner with the law firm of Shaw, Pittman, Potts and Trowbridge, as TRIP's counsel, negotiated the terms and conditions of the construction contract between TRIP and Brown & Root;

(f) Mary Jane Dodson, a partner with the law firm of Shaw, Pittman, Potts and Trowbridge, negotiated the terms of the loan agreements between TRIP and the project lenders;

(g) Timothy Sutherland, formerly the Vice President of Shenandoah Greenway Corporation, prior to his June 1994 resignation (i) coordinated the financing of the TRIP partnership, including arranging for the equity contributions by the partners, (ii) negotiated the loan agreements and (iii) supervised preparation of budgets;

(h) Rick Froelich, TRIP's chief financial officer, supervised preparation of draw requests on the credit facilities used to finance construction and operation of the DTRE;

(i) James Cowen, Brown & Root's in-house counsel, negotiated the construction contract with TRIP, as well as the financing agreements between TRIP and the lenders, and also provided general legal and business advice to Brown & Root executives during the course of the DTRE project;

(j) John Sole, former Vice President of Brown & Root's civil division, regularly attended TRIP's management committee meetings as Brown & Root's representative, and was responsible for Brown & Root's equity investment in the DTRE and for Brown & Root's construction contract with TRIP;

(k) Ernest Richardson, Senior Administration Manager for the Large Project Group in Brown & Root's civil division, participated with Cowen in negotiating the Brown & Root construction contract with TRIP;

(l) Richard Slater was Brown & Root's Construction Manager for the DTRE segment built by plaintiff Moore;

(m) Don Aldridge was Brown & Root's DTRE Controls Manager, and as such, was responsible for scheduling, cost, and document control;

(n) James Harvey, Brown & Root's DTRE Project Manager, supervised the Brown & Root DTRE project management team, which included a contracts administrator, an administration manager, and a controls manager;

(o) Lawrence Henry, Brown & Root's Director of Corporate Development of Finance, participated in structuring Brown & Root's DTRE equity investment;

(p) Robert Gibbons, a partner with the law firm of Debevoise & Plimpton, represented the lenders in negotiations with TRIP concerning the DTRE project; and

(q) John Michael Dougherty was Brown & Root's Administrative Manager on the DTRE project, in charge of accounting, accounts payable, cost reporting, and, to some extent, personnel.

## B. Facts Common to All Claims

7. The 14–mile long DTRE, also known as the Dulles "Greenway," connects Leesburg, Virginia and the Dulles Toll Road at Dulles International Airport. The Greenway is a private toll road owned by TRIP. Ten years after the expiration of the original permanent financing, TRIP's Certificate of Authority to operate the road terminates, and the road assets will be dedicated to the public use of the Commonwealth of Virginia. Va.Code § 55–551.

8. Brown & Root became involved in the DTRE project in 1992, when Peter Kiewit

Sons' Co. ("Kiewit"), a large general contractor, withdrew from the project. At that point, the Toll Road Corporation of Virginia ("TRCV"), TRIP's predecessor, sought an equity investor and replacement general contractor for construction of the project; after a period of due diligence review, Brown & Root decided to become a DTRE equity investor and its general contractor.

9. On September 16, 1993, Brown & Root, as the DTRE general contractor, entered into separate subcontracts with plaintiffs for the construction of portions of the DTRE. Both subcontracts contained the following General Condition 3.1.4:

> Notwithstanding any other provision hereof, payment by Owner to General Contractor is a condition precedent to any obligation of General Contractor to make payment hereunder; General Contractor shall have no obligation to make payment to Subcontractor for any portion of the Sublet Work for which General Contractor has not received payment form the Owner.

10. Two weeks later, on September 29, 1993, Brown & Root signed a construction contract with TRIP, TRCV's successor, for construction of the entire DTRE. John Sole signed the construction contract for Brown & Root; Jim Cowen reviewed and approved it.

11. The construction of the DTRE under these contracts was divided into three segments, with Lane responsible for the construction of one segment, Moore responsible for the construction of the second segment, and Brown & Root responsible for the construction of a third segment as well as supervision of the entire project. Construction began in late September 1993, with substantial completion of construction scheduled for late March 1996. In fact, substantial completion occurred 182 days early, on September 29, 1995. Brown & Root notified TRIP by letter in early January 1996 that it had achieved final completion by December 29, 1995. The Virginia Department of Transportation (VDOT) determined that the DTRE was complete on May 31, 1996.

## C. The Change of Scope Claims

12. Concurrent with the negotiation and signing of the construction contract and sub-contracts, TRIP negotiated with a group of banks and insurance companies for a loan of approximately $256 million (i) to pay certain approved pre-development expenses and (ii) to cover the construction and permanent financing for the DTRE.

13. The insurance companies, who ultimately became the project noteholders, were represented by Robert Gibbons of the New York law firm of Debevoise and Plimpton. Gibbons told Frank Baltz, TRIP's counsel, that the lenders needed a high degree of certainty as to the costs of the project because it was a limited recourse project financing. Thus, Gibbons considered important both the contract price and the procedures designed to provide reasonable assurance that no unanticipated change orders would occur. To this end, Gibbons provided memoranda setting forth the lenders' positions on the construction contract drafts under negotiation between Brown & Root and TRIP. Specifically, on June 18, 1993, Gibbons sent Baltz and Cowen a long memorandum commenting on several aspects of the draft construction contract then under review. In one section of the June 18, 1993 memorandum, Gibbons questioned several examples of design changes included in the draft contract to illustrate anticipated or potential changes in the scope of work. The examples included a change in the length of a bridge, a change in the radius of the ramp, and a change in the nature or thickness of sub-base materials. None of these had been changes in work scope under the 1992 draft contract between TRCV and Kiewit.

14. Baltz received and reviewed the June 18, 1993 memorandum from Gibbons and responded point-by-point in a letter, which he sent to Debevoise & Plimpton. James Harvey, Lyle Byrd, and Gary Kuhn also received and reviewed the June 18, 1993 memorandum from Gibbons and responded internally on behalf of the Brown & Root project management team in an Interoffice Memorandum to Ernie Richardson dated June 28, 1993. On the issue of the design change examples, Harvey, Byrd and Kuhn responded to the June 18 Gibbons memoranda as follows:

The D & P comment is likely not related to the concept of changing the Lump Sum Price, but rather establishing a *lump sum* amount for the construction loan. In any case, the decision as to whether the owner or the contractor will control the contingency pool of money for change orders has to be made. Either Brown & Root and the subcontractors can put contingencies in their Lump Sum prices or the owner can put contingencies in the construction loan. In fact, Brown & Root ultimately did nothing to ensure that an adequate contingency fund to accommodate work scope changes was included in TRIP's construction loan.

15. On July 16, 1993, at a meeting for project participants in northern Virginia, Baltz stated that TRCV and Brown & Root had agreed to the lenders' request to delete from the construction contract any reference to the specific illustrations of design changes that would constitute changes in the scope of work. Richardson was shocked by Baltz's statement. He complained to Charles Williams and Baltz that Brown & Root had never discussed or agreed to the deletion of the illustrations of the scope of work changes. Further, he told them Brown & Root would not accept the deletion of these illustrations and suggested that the lenders be so advised. In response, Williams suggested including the illustrations in a side letter between Brown & Root and TRCV rather than revisiting the issue with the lenders.

16. Baltz sent a letter to Gibbons and Brewster on July 23, 1993 confirming the statement made at the July 16, 1993 meeting regarding the deletion of illustrations of changes in the scope of work. In the second paragraph of the letter, Baltz wrote:

> The changes in this draft are made in response to points raised in our meeting on July 16, 1993, and to further clarify the owners' agreement with the Contractor. Brown & Root has agreed that this document represents the final agreement between the parties subject to agreement upon the appendices.

Later in his letter, Baltz reiterated the deletion of design changes from the Contract by referring to the specific section, as follows:

> Section VIB.3—*Changes in Project Scope through "Design Changes"*—In Paragraph

(a), the parties have agreed to delete any illustration as to what would constitute an addition to the scope of the project because the parties believe that there will not be any major changes to the scope of the project.

17. Richardson, concerned about the decision to delete the illustrations of scope of work changes, asked Harvey to identify the change of work scope and any other issues he wanted addressed and to clarify Brown & Root's understanding of those issues. Harvey, the Brown & Root executive most knowledgeable about anticipated design changes, responded with a "Memorandum of Understanding," dated August 11, 1993, addressing such work changes, as well as other issues. Harvey and Kuhn sent the Memorandum of Understanding to Richardson and Cowen. Harvey's next weekly project report indicated that the purpose of this Memorandum of Understanding was, at least in part, to circumvent the July deletion of the illustrations of design changes from the July 23, 1993 draft contract. Specifically, Harvey wrote:

> We have received the 23 July 93 revision of the contract. This version contains changes made to placate the Lenders. Presently, we are preparing input for a 'Memorandum of Understanding' to be finalized by Jim Cowen for transmittal to and agreement with TRCV. The intent of the Memorandum is to record and agree with the TRCV on those concepts, intents and philosophies that have been addressed in various meetings during the contract evaluation.

18. The Memorandum of Understanding is keyed to the various sections of the Construction Contract. The section pertinent to the change of scope provision is as follows:

> Regarding items that are not to be construed as 'minor,' in the previous discussions of the Construction Contract, it had been agreed that all 'design changes' would be considered 'outside of the project scope.' This would be inclusive of changes in quantities caused by design changes. It is important to note that B & R accepts that certain items will be incorporated into the drawings that were not complete at the time B & R prepared their FFP; and that B & R accepts that the inclusion of an item

such as a guardrail on a plan drawings where a guardrail would have been included based on normal design practice would not be construed as a design change. However, as previously agreed, such items as an increase in the length of a bridge, a change in the radius of a ramp, or a change in the nature or thickness of sub-base materials, or a change in an inter-parcel connector, or the addition of an interchange, or the addition of a bridge, or changing a slope to a wall, or the addition of lighting or additional signage have been agreed as items that are 'outside of the project scope.'

19. Harvey was aware of 1991 discussions among the VDOT, TRCV, and Griener (a consulting engineering firm retained by the lenders) indicating that the pavement design proposed by Kiewit was on the "marginal end;" Griener had recommended additional pavement thickness. Harvey's testimony that he was told that the State had approved the pavement design and that the design change would not occur is not persuasive in light of his admission that he remained concerned in September 1993 about the pavement thickness issue "because the issue had not been laid to rest." Harvey also knew in summer 1993 that the drawings, including the pavement sections, had not yet been approved by VDOT, who had the right to make changes in the roadway design under the terms of the comprehensive agreement.[2] Harvey's trial testimony that he believed the pavement thickness design change would not occur is further undermined by his testimony in the arbitration case between TRIP and Brown & Root. There, he explained why he wanted the specific illustration of a design change in the thickness of a pavement section to be included in Section 2.C of the Policy and Procedures Letter:

> Griener still had a note rattling around that they wanted an inclusion of an extra 3 inches of open-graded base (OGB). Dewberry & Davis had resisted them, had proven numerous times it was not necessary. We were concerned that if this went

through another cycle, that this time Griener might win out. So, obviously, this is not a $1.98 item. That's why we insisted on this being in here.

20. Richardson and Cowen sent a copy of the Memorandum of Understanding to Baltz and Williams in late August 1993. A few days later, Cowen and Richardson called Baltz on the telephone to discuss the Memorandum of Understanding. Baltz said he thought the memorandum should be reviewed by the lenders and would so advise his client, TRIP, i.e., Williams. Richardson indicated he, too, would speak with Williams.

21. Richardson briefed his project management team about his conversation with Cowen and Baltz. Harvey's weekly project report for August 27, 1993, reports the briefing as follows:

> 4.1 BASIC CONTRACT. The Project office was debriefed by Messrs. Richardson and Cowen regarding discussions held with TRCV's legal counsel Frank Baltz with respect to the Memorandum of Understanding dated 11 August 1993. Messrs. Richardson and Cowen reported that Baltz felt he would need to show this memo to the lenders and that may cause some concerns. Alternatively, Baltz recommended that he provide an 'unofficial' copy to General Williams who would discuss the matters with Jim Harvey. From those discussions, it would be determined which items should be incorporated into the final contract. Baltz's alternative suggestion was accepted.

22. Baltz told Williams that the matters contained in the Memorandum of Understanding could not be part of the construction contract. Nevertheless, Williams and Richardson agreed, after limiting the scope of the Memorandum of Understanding, to put the remaining items in a "Policy and Procedures Letter." The Memorandum of Understanding eventually became the side agreement known as the Policy and Procedures Letter, dated September 23, 1993 and signed by Brown & Root's Harvey and TRCV's Williams.[3]

---

**2.** A letter from Dewberry & Davis, TRIP's design engineering firm, specifically advised Harvey that the drawings were subject to final revision and had not been finally approved by VDOT.

**3.** Thus, the Policy and Procedures Letter was signed approximately one week after the subcontracts were signed and one week before the prime construction contract between TRIP and Brown & Root was signed.

23. Cowen testified unpersuasively that he never followed up on the Memorandum of Understanding and believed that it was something the project people worked out with their counterparts at TRIP; rather, it appears that Richardson and Cowen reviewed the final draft of the Policy and Procedures Letter before it was sent to Harvey to be signed by him and Williams.

24. Cowen claims he was not told that the Policy and Procedures Letter was signed in September 1993 and did not become aware of its existence until the spring of 1994. Again, Cowen's testimony is unpersuasive given Richardson's contrary assertions and Cowen's endorsement of the decision to have the side agreement handled "unofficially" between Harvey and Williams.

25. Cowen also offered an unpersuasive explanation for the failure to disclose the existence of the Policy and Procedures Letter to the lenders, namely that it was not Brown & Root's but TRIP's duty to do so, and that in any event it was a clarification letter rather than an amendment to the contract and thus did not have to be disclosed. Also, although Cowen claims that he did not think that the lenders' insistence upon the deletion of the illustrations of design changes from the construction contract was significant, he admitted to a concern that Brown & Root's project people would consider it important to include the illustrations of design changes in the contract.

26. Baltz saw a draft of the Policy and Procedures Letter before it was signed by Williams. He told Williams he could not sign the Policy and Procedures Letter because it contained language that the lenders specifically said could not be included in the construction contract, including the illustrations of design changes that would be changes in the scope of work.

27. Although Williams denied that Baltz advised him not to sign the Policy and Procedures Letter, this denial is unpersuasive given his admission that Baltz had previously advised him that the material in the Memorandum of Understanding could not be included in the construction contract.

28. Sole, Brown & Root's civil division vice president, received a copy of the Policy and Procedures Letter in Houston, Texas, a short time after it was signed by Harvey in late September 1993. Sole understood the importance of, and was responsible for, the Policy and Procedures Letter. Sole understood that the Letter's purpose was to "put it all to bed," that is, to end the ongoing negotiations over scope changes.

29. Sole knew the lenders wanted to minimize or eliminate the potential for changes to cap the potential financial liability on the project and to assure that no future funding would be required. Sole also knew and understood that the illustrations of design changes in the Policy and Procedures Letter were concrete examples of expensive design changes common to highway projects. Sole also knew in November 1993 that the lenders had reserved the right in the Note Agreement to refuse to approve any change in excess of one hundred thousand dollars ($100,000) if in the engineer's reasonable judgment approval of the change order would be likely to have an adverse effect on the condition of the project.

30. Sole never told the subcontractors, and did not recall directing Cowen, or any other Brown & Root representative, to tell the subcontractors, that the lenders had the right to refuse such change orders. As a result, plaintiffs were never made aware that the lenders could, under the Note Agreement, refuse to fund scope change claims for which Brown & Root was entitled to be paid by TRIP under the construction contract and the Policy and Procedures Letter.

31. By the time plaintiffs executed the subcontracts on September 16, 1993, the negotiations with the lenders over the illustrations of scope changes in the Brown & Root construction contract had been concluded resulting in the exclusion of the illustrations of scope of work changes. The events leading to the execution of the Policy and Procedures Letter shortly after the signing of the subcontracts were not communicated to plaintiffs prior to the execution of the subcontracts, which included so-called "pay when paid" provisions.

32. The lenders requested and received specific written assurances from Brown & Root, in the form of a set of representations and warranties contained in a Consent

Agreement, that it had no reason to believe any design changes would be necessary prior to completion of construction. This, too, was not revealed to plaintiffs prior to their execution of the subcontracts.

33. Sole and Cowen were responsible for the due diligence review regarding the truth of the representations and warranties contained in the Consent Agreement. In doing so, they did not address the Policy and Procedures Letter as part of their due diligence effort, and thus the representation that no changes were anticipated did not take into account the Policy and Procedures Letter or the reasons that Brown & Root had insisted on including in that Letter the illustrations of changes that had been deleted from the prime construction contract.

34. Beginning in May 1994, Brown & Root directed plaintiffs to perform the extra work caused by various design changes, including changes in the thickness of the subbase materials and changes in the guard rail required. The work from changes in scope resulted in an additional adjusted expenditure of $2,154,147.01 by Moore and $1,474,-530.30 by Lane.[4]

35. By May 1994, Timothy Sutherland, TRIP's Chief Financial Officer, had concluded that TRIP did not have sufficient funds to cover the anticipated cost of completing construction of the road.[5] At a TRIP Management Committee meeting in Rome, Italy in May 1994, Sutherland gave the Management Committee members, including Sole, a revised project budget describing the project's financial condition since financial closing in November 1993. Sutherland added $2 mil-lion to the revised budget for construction cost contingency based on information from Sole; Sutherland estimated that the project needed an additional $6 million to achieve completion.

36. In a letter dated October 31, 1994, Harvey indicated his concern that if the Brown & Root construction contract price were increased to cover the "forecasted costs" of design changes, the lenders would refuse to fund the project altogether, or alternatively, charge burdensome interest on the additional loan amounts necessary.

37. In December 1994, Rick Froelich decided that he had to disclose to the lenders that TRIP might not have adequate funds to finish the project and, therefore, could not make the unconditional representation that funding was adequate as required in support of each monthly draw request.

38. TRIP's counsel, Mary Jane Dodson, was well-versed in the terms and details of the Loan Agreement and Note Agreement. In December 1994, she stated her opinion that the Series D Notes (the cost overrun facilities) could not be accessed to pay design change claims being submitted by Brown & Root.[6]

39. Sole prepared for the lenders' conference call on January 26, 1995, by making notes of talking points, including the evidentiary support the Policy and Procedures Letter provided for Brown & Root's design change claim. Yet, he never mentioned the Letter when he presented Brown & Root's claims to the lenders. During the call, Denise Duffee, the Cigna representative, told

---

4. These figures are the adjusted amounts the arbitrator found that Brown & Root and the subcontractors had proved were owed for the scope change claims. These amounts, which are set forth in the arbitrator's supplemental report, were made a part of the instant trial record. The original report awarded $2,279,147.01 to Moore and $1,624,530.30 to Lane; the supplemental report reduced these amounts to the figures noted here.

5. Apparently, construction costs, legal fees, transfer costs from TRCV to TRIP, operation and maintenance costs of Autostrade, and the toll booths were "busting the budget."

6. Additionally, the conditions precedent to TRIP's ability to access the Series D Notes to pay additional project costs are listed in Section 4.4 of the Loan Agreement. The first condition precedent to a draw on the Series D Notes is that the representations and warranties of each "Affiliated Obligor" must be true and correct as of the cost overrun funding date or such earlier date if the representations and warranties speak expressly as of an earlier date. This condition was not met given that Brown & Root made express representations and warranties in the Contractor Consent that it had no reason to believe that change orders would be necessary prior to the completion of construction even though Harvey had reason to believe design changes increasing the thickness of pavement section or sub-base could be required.

Sole that Brown & Root had represented that there would be no changes and that the lenders would not pay Brown & Root's claim.

40. Sole did not mention the Policy and Procedures Letter in support of Brown & Root's claim to entitlement for design changes because Williams called him on January 25, 1995, and asked him not to mention the Policy and Procedures Letter. Sole made the following note of the conversation:

Chuck doesn't want to get bogged down into the details of the "Policy Letter." Chuck wants to be protected on this. Don't bring it up.

41. Williams wanted to be protected against disclosure of the Policy and Procedures Letter because two months later the lenders gave notice of default under the Loan Agreement with TRIP based on Williams' execution of unapproved contracts. At the time the notice of default was given, the lenders were still not aware of the existence of the side Policy and Procedures Letter.

42. Baltz finally disclosed the Policy and Procedures Letter to the lenders in June 1995, three months before plaintiffs completed their work. The lenders were surprised and concerned that Harvey and Williams had made a side agreement regarding design changes without disclosing it to the lenders.

43. Sole was unpersuasive when he testified that when Brown & Root ordered plaintiffs to perform the extra work caused by the design changes in the thickness of the pavement in May 1994, there were several potential sources of funding for the scope changes: (i) additional equity by the partners, (ii) an additional loan facility from the existing lenders, (iii) a loan facility from new lenders, and (iv) a refinancing or restructuring of the existing financing on the project.

44. Sole was also not persuasive when he testified that Brown & Root had a realistic expectation that the scope change claims would be paid by TRIP through additional debt, additional equity contributions or refinancing.

45. In November, 1993, both Brown & Root and Autostrade had declined to contribute additional equity to TRIP when a prospective partner dropped out at the last minute, leaving the partnership short of equity for financial closing. At that time, the Bryant family had provided the additional equity. The Bryant family, however, was not willing to contribute additional equity to TRIP to pay Brown & Root's claims.

46. Brown & Root had a longstanding general guideline that limited its equity contribution to a project to the projected profits on the construction side. Brown & Root's projected profit on the DTRE was $15 million to $18 million. It had already invested $16.6 million in equity at closing in November 1993.

47. Sole claimed that a refinancing was a plausible source of funds to pay the scope change claims. Yet, the cost of prepaying the $256 million credit facility was approximately $50 million due to a "Make Whole Premium" in the Note Agreement. Sole admitted this was a formidable obstacle to any effort to refinance the project.

48. All efforts to refinance the project's debt failed. Efforts to raise additional debt met the same fate.

49. Sole's "ultimate backstop" was trading the scope change claim for additional equity in the project. Brown & Root never pursued this option because shortly after the road opened in 1995, it became obvious that toll revenue was disastrously low, eliminating Brown & Root's interest in increasing its equity stake in the project.

50. In sum, the record convincingly reflects the following facts:

(a) Brown & Root knew, and reasonably should have known, that scope of work changes in the construction of the DTRE would be necessary to accommodate design changes, particularly the most significant of the changes that did occur, changes in the pavement thickness. This fact found expression in a draft of the construction contract between Brown & Root and TRCV. Ultimately, however, this provision was removed from the construction contract because TRCV insisted on accommodating the lender's requirement that there be a fixed price and no changes in the scope of work. Brown & Root acquiesced in this decision and entered into the Policy and Procedures side letter in an attempt to protect itself, all the

while concealing from the lenders its expectation that design changes would occur.

(b) Brown & Root did nothing to ensure that adequate contingency funding for changes in the scope of work was obtained in the construction loan between the lenders and the owner. Brown & Root did not disclose to plaintiffs (i) the events leading up to the creation of the Policy and Procedures Letter, which would have disclosed the lenders' strongly held position against additional changes in scope, or (ii) that as a result of the lenders' position and the efforts of both TRIP and Brown & Root to placate the lenders, no adequate funding had been obtained to cover the costs of such changes. Thus, plaintiffs signed the sub-contracts containing the paid-when-paid clauses without this knowledge.

(c) Brown & Root knew in May 1994 when it ordered the subcontractors to perform the work required by the design changes that were changes in the scope of work that (i) the DTRE construction budget was seriously underestimated, (ii) that no sources of funding existed for payment to it from the owner for changes in scope of work, and (iii) that the subcontractors were unaware that no sources of funding existed for payment by the owner to Brown & Root for changes in the scope of work. Nonetheless, Brown & Root ordered the subcontractors to perform the work.

### D. The Contractor Bonus

51. The matter of a contractor bonus for early completion of the project was the subject of extensive negotiations between Brown & Root, TRIP and the lenders before the signing of the prime construction contract between TRIP and Brown & Root and the financing agreements between TRIP and the lenders.

52. On June 18, 1993, Gibbons wrote a memorandum that questioned the proper characterization of the payment of a contractor bonus to Brown & Root, specifically whether the payment of an early completion contractor bonus to Brown & Root was more appropriately understood as an additional re-

turn of equity to one of the equity partners that should be subordinated in priority and in time of payment to the external liabilities of the owner, TRIP. Gibbons noted that because Brown & Root was a partner in the project, the lenders viewed the contractor bonus as a premature return of a partner's equity capital.

53. The July 23, 1993 draft construction contract between Brown & Root and TRCV stated that the contractor bonus would not be paid at completion and final payment unless adequate funds were available to the owner after payment of all costs of development, construction and start-up of the project, and after provision for operating expenses and debt service payments during the period between substantial completion and highway operations. The draft contract noted further that in the event the contractor bonus was not paid to the contractor at final payment because adequate funds were not available, the owners' obligation to pay the contractor bonus became an obligation of the owner subordinate to the owners' debt to the lenders and would not be paid until the owners' debt to the lenders was repaid in full.

54. Harvey and Kuhn concluded that the contractor bonus clause in the July 23, 1993 contract provided no bonus at all to Brown & Root or the subcontractors. They addressed the issue in their August 11, 1993 Memorandum of Understanding [7] as follows:

The offering of a worthwhile bonus to encourage acceleration of the Work and cover the costs therefore is a prerequisite of B & R's corporate management to the signature of the Construction Contract. The Owner has always contended that he wants to encourage early completion of the Project as it will provide savings to him. However, the language of this section in the 23 July version of the Construction Contract provides no incentive as there is no definition as to when the bonus would be paid nor is there any statement as to the amount of the bonus. Neither Brown & Root or (sic) their subcontractors be-

7. The August 11, 1993 Memorandum of Understanding written by Harvey, that eventually became the Policy and Procedures Letter, ad-

dressed other subjects in contention, in addition to the change of scope issues, including the early completion bonus.

lieves there is a bonus being offered for this Project.

Brown & Root has explained that a contractor must expend additional monies in order to accelerate its work and that the contractor must recover those monies soon so as not to cause a burden to his cashflow. The Owner has indicated that he empathizes with this situation.

Therefore, unless agreed otherwise, Brown & Root assumes that the Owner will pay the bonus within 60 days of the Highway Operation Date and that the amount of the bonus will be a minimum of 50% of the liquidated damages stated in the Construction Contract.

55. Although Cowen complained directly to the lenders about the lenders' restrictions on the payment of the contractor bonus, Brown & Root eventually acquiesced to the lenders' demands.

56. Gibbons later decided that the contractor bonus provisions were so complex and interrelated with the financing agreements that they should be removed from the construction contract and dealt with in the financing agreements instead; he thought that as an early return of capital, any bonus to Brown & Root should be dealt with directly in the ownership documents [8] and incorporated by reference in the construction contract. Although Baltz thought that the contractor bonus terms should be in the construction contract, Gibbons's view prevailed.

57. Consequently, the Note Agreement contained the restrictions on payment of the contractor bonus, which was divided into two parts, a restricted bonus and an unrestricted bonus. The restricted bonus, as defined in the Note Agreement, could be paid upon final completion only if, among other conditions, the outstanding balance of the supported revolving credit loan was zero. Under the financial projections, the supported revolving credit loan would not be reduced to zero until approximately five to seven years after the road opened. Thus, as Cowen, Henry and Sole knew, any payment of the restricted

bonus would be in five to seven years. The unrestricted bonus, as defined in the Note Agreement,[9] was similarly burdened by conditions, which included conversion of the bank loans and the funding of a series of prior reserve accounts before any money would be available to pay the unrestricted bonus. The lenders and their counsel doubted that the unrestricted bonus would be available to pay a bonus at the completion of construction, but in any event, the required conversion of the bank loans never took place because traffic revenues fell far below projections and funding the accounts, therefore, became an impossibility.

58. The final version of the construction contract contained only the following provision for a contractor bonus:

IV.I  *Contractor Bonus.*  If the Contractor achieves Substantial Completion prior to the Deadline for Substantial Completion, the Contractor shall earn a bonus equal to fifty percent (50%) of interest payments which would otherwise be payable by the Owner to the Financing Parties between the date of Substantial Completion and the Deadline for Substantial Completion, assuming the Conversion Date (as defined in the financing agreements with the Financing Parties) did not occur until the Deadline for Substantial completion (the "Contractor Bonus"). Subject to the provisions of the financing agreements with the Financing Parties, the Contractor Bonus shall be payable at Final Payment.

59. The definition of "project costs" in the Note Agreement specifically excluded the contractor bonus, thereby preventing use of any of the proceeds of the Notes or bank loans, except from any funds in the unrestricted bonus account, to pay the contractor bonus. Moreover, because the contractor bonus was excluded from the definition of project costs, the Series D Notes were unavailable to pay the contractor bonus. Brown & Root did not disclose to plaintiffs that the contractor bonus was not a project cost.

---

**8.** The ownership documents include the TRIP II Partnership Agreement and the Note Agreement.

**9.** The theory of the unrestricted bonus was that excess cash flow resulting from early completion could be used to pay part of the contractor

bonus, but the lenders and their counsel, Gibbons, doubted that early completion would be sufficiently beneficial to the project cash flow to create a fund for the payment of the bonus at the completion of construction.

60. Because of these financing arrangements, Brown & Root wanted evidence that the contractor bonus obligation continued specifically as a partnership obligation. Thus, Cowen requested that the TRIP II Partnership Agreement include a section outlining the terms of a Contractor Bonus Note representing the deferred obligation to pay the contractor bonus. Article 2.04(d) of the Amended and Restated TRIP II Partnership Agreement therefore provides that if limitations imposed by TRIP's lenders prevented Brown & Root from receiving the full amount of the contractor bonus to which it was entitled under the construction contract, Brown & Root would be deemed to have loaned TRIP the amount of the shortfall. The loan would be due and payable on March 31, 2008, and would be subordinated to all senior debt of TRIP.

61. Richardson met with Sibert and Wheeler in August of 1993, before the subcontracts were signed, to present a contractor bonus sharing proposal.[10] The proposal Richardson distributed at the meeting contained no representation about the timing of payment of the contractor bonus or the terms of the financing agreement which subordinated it to the project debt. Moreover, Richardson made no oral representation that the bonus would be paid at any particular time, nor did Richardson state that the bonus was subordinated to other obligations. Richardson said they were still working on the terms of the bonus in the prime contract and for that reason the terms of the bonus with the subcontractors could not be resolved at that time.

62. At the time of the meeting, Brown & Root had not finalized many of the terms governing payment of the contractor bonus, but Richardson knew that the bonus would be subordinate to the project debt. Richardson nonetheless told Wheeler and Sibert at the meeting that he felt it would not be a long time before there was money to pay the bonus since early completion would save "big bucks" on debt service.[11] No early completion bonus provision was included in plaintiffs' subcontracts.

63. Sole was surprised to learn in March 1994 that although the project had broken ground in September 1993, no early completion bonus incentive agreement was yet in place. He told Harvey and Golson, Harvey's supervisor at Brown & Root, to finalize the contractor bonus.[12]

64. Cowen gave Harvey a "shorthand way" of dealing with the complicated bonus funding arrangement. Cowen told Harvey that there was a "waterfall" account that needed to be funded and to the extent that money fell out of that account and into the bonus account, there would be money for Brown & Root, but otherwise there would be no payment until funds were available for distribution to the partners.[13] Cowen gave Harvey no instructions about what information to pass on to plaintiffs; he left the decision regarding the extent of disclosure to plaintiffs up to Harvey and Richardson. Harvey did not tell Cowen what, if anything, he planned to tell plaintiffs about the terms and conditions of the contractor bonus.

---

10. Richardson's proposal contained a complex formula for division of the contractor bonus division based upon the size of the respective portions of the road and on which contractor finished first.

11. Shortly thereafter, on September 24, 1993, Wheeler had a conversation with Harvey during which Harvey said that the bonus money would come from a $7.5 million contingency fund. Wheeler made a written note of Harvey's statement.

12. In May 1994, Sole advised Crane in a draft letter that Lane and Moore "have not yet accepted the possibility that the bonus payment could be deferred beyond the end of the job due to the terms of the main Contract and this could have a

negative affect (sic)." He concluded that letter by noting:

> I am very optimistic that we can achieve an accelerated completion. I feel that anything that the Board of Management of TRIP–2 can continue to do to help remove some of the obstacles will be of tremendous assistance. These include ... the final resolution of the contractor bonus for early completion (so that the subcontractors can be incentivised with a good degree of assurance including making payment of the bonus to the subcontractors at the end of the job). ...

13. Henry never discussed the details of funding the bonus with Harvey because Sole sent him a letter cautioning him not to pass equity related information to project people such as Harvey.

65. On June 28, 1994, Harvey met with his project management staff to discuss the presentation he planned to make to plaintiffs regarding the early completion bonus. Dougherty, Aldridge, Kuhn, and Humphries attended. During that meeting, Harvey advised his staff, using a flipchart,[14] (i) that the bonus was based upon a completion date of March 30, 1996, (ii) that the bonus was one-half (½) of the liquidated damages or $42,000.00 – $43,500.00 a day, and (iii) that they would pay a bonus to subcontractors only when the owner paid Brown & Root the bonus. Harvey also told his staff (i) that the bonus was an obligation of the owners which was based on the owners' cash flow and was not funded by the lenders; (ii) that the bonus was subordinated to four or five other obligations of the owners which had to be retired first and that the bonus had a five to seven year horizon for payment; and (iii) that interest would be paid on the bonus for five to seven years.

66. Aldridge made a note during the June 28, 1994 meeting that Harvey planned to tell plaintiffs certain information about the contractor bonus verbally rather than in writing. Aldridge's notes reflect that the information to be given orally was: "Bonus as Stands, $42,500 split, Payment s/o = 5 to 7 years plus interest." [15]

67. Harvey scheduled separate meetings with Lane and Moore for August 2 and 3, 1995, to present a new early completion bonus proposal.[16] Harvey's handout for those meetings (i) did not disclose that the bonus could not be funded out of project debt; (ii) did not reveal that the bonus was deeply subordinated to the project debt; (iii) did not explain that the bonus was payable only when funds were available for distribution to partners; and (iv) did not mention that the project cash flows projected that distributions to partners, and thus the Brown & Root bonus, would be delayed for five to seven years after road opening.[17] The handout did state the overall bonus was payable if and when payment was received from TRIP.

68. Aldridge attended the meetings with the subcontractors on August 2 and 3, 1994. Aldridge's notes of those meetings do not reflect any statements by Harvey that payment of the bonus would be subordinated to project debt or delayed for five to seven years.[18]

69. Dougherty, who attended the August 2 and 3, 1994 meetings with Lane and Moore, does not remember Harvey saying at either of those meetings that the subcontractor bonus was subordinated to four to five other debts or was payable in five to seven years; instead, Harvey communicated that a high

14. Aldridge's notes of that meeting list the entries Harvey put on the briefing flipchart that he used during the meeting.

15. In July 1994, Sole did not believe it was feasible for the bonus to be paid at completion of construction, but does not recall communicating this belief to Harvey or Kuhn, who conducted the early completion bonus negotiations with plaintiffs. On July 28, 1994, Sole wrote a letter to Williams indicating that although it would be helpful if TRIP supported an application to the lenders for early payment of the bonus, Brown & Root was prepared to live with the payment to be made as provided in the "waterfall" funding, namely, in five to seven years. In August 1994, Sole made a note to himself to advise Harvey that the project lenders were not inclined to release funds to pay the early completion bonus at road completion rather than over the five to seven years required in the waterfall funding. Sole never communicated this information to Harvey.

16. Beginning in August 1994, Sole felt pressure from the TRIP management committee to repre-

sent to the lenders that the DTRE could be completed ahead of schedule. The source of this pressure was apparently some difficult TRIP had in late August and early September 1994 finding funding for the purchase of the toll collection equipment. On August 30, 1994, Sole advised Harvey that there was a big push for Brown & Root to give TRIP an accelerated completion schedule. Sole expressed to Harvey his unhappiness that the negotiations over the early completion bonus agreements with the subcontractors had gone on for so long, and his frustration at the lack of progress. On September 28, 1994, Sole issued a "comfort letter" to Crane providing assurances that there was an 80% probability that the road could be completed by September 30, 1995.

17. Harvey did not show plaintiffs the flipchart listing this information.

18. Aldridge's testimony regarding verbal statements as to the subordination or timing of the bonus is not persuasive in light of Wheeler and Sibert's testimony, Dougherty's testimony, and his own notes of the meeting.

degree of uncertainty around the timing and payment of the contractor bonus existed.

70. Harvey testified unpersuasively that he told Wheeler and Sibert "many" times that five to seven years was the model for which payment of the bonus might be made, although he was not sure whether he gave them this information on August 2 and 3, 1994. He also testified that he had, at unspecified times, informed Sibert and Wheeler that the bonus was TRIP's obligation, dependant upon certain financial obligations being met.

71. Wheeler testified persuasively that Harvey did not state during the Lane meeting on August 2, 1994, that the contractor bonus was payable in a five to seven year period, that it was subordinated to the entire project or that it was an obligation of the partnership not funded by the lenders. Wheeler was told that the timing for payment of the bonus was still undetermined.

72. Sibert's testimony as to the August meeting with Moore was also persuasive. Sibert left his meeting with Harvey with the same impression that Wheeler had from the Lane meeting, namely, that payment would be at final completion or within a reasonable period of time after that. Harvey never mentioned that the terms of the bonus agreement between Brown & Root and the owner had been fixed; instead, Harvey stated that they were still working on the bonus agreement. Harvey never told Sibert that payment would delayed for five to seven years, that the bonus had been subordinated to all the other project debt, and that the payment could not be made until partner distribution funds were available.

73. Sibert's chief recollection of the August meeting was that Harvey's bonus proposal differed significantly from Richardson's proposal a year earlier. Harvey proposed a $500,000.00 down payment out of Brown & Root's own pocket if plaintiffs completed the project by December 31, 1995, but no bonus if they finished one day later. Sibert viewed that proposal as a loss of approximately $600,000.00 in potential bonus, and as an attempt by Brown & Root to keep the lion's share of the bonus.

74. Because Harvey did not disclose the anticipated substantial delay in receipt of the contractor bonus or the details of the financing arrangements of the bonus, Sibert and Wheeler did not understand that the Brown & Root "down payment" proposal was a way to eliminate the substantial risk of non-payment or substantially delayed payment of Brown & Root by the owner. Sibert testified persuasively that the only time frames under discussion were substantial completion, final completion or a reasonable close-out period after final completion of about 90 days.

75. Sibert and Wheeler conferred and subsequently rejected Brown & Root's proposal and made a counter-offer, in which they proposed that any bonus earned by Brown & Root would be divided equally among the three contractors. Plaintiffs agreed to identical early completion bonus change orders to their respective subcontracts on September 30, 1994, change orders that were based on plaintiffs' counterproposal.

76. The first paragraph of each early completion bonus change order states:

> As of the date of the Change Order No. 4[06] ... the owner has stated to General Contractor that an incentive Bonus to achieve Substantial Completion of the General Contractor's Work will be provided. However, the Owner has not informed General Contractor the daily amount of the bonus nor when the bonus will be paid to General Contractor, i.e., how long after receipt of the Substantial Completion Certificate of the General Contractor's Work Scope the bonus (if any) is paid to General Contractor from the Owner.

77. In the change orders, Brown & Root represented that it was still negotiating the terms of its own construction contract regarding an early completion bonus payment and promised to "endeavor" to provide a copy of the contractor bonus provisions of the construction contract as soon as they were available. Brown & Root further promised to consult plaintiffs before having discussions with TRIP regarding the contractor bonus in the construction contract. Brown & Root also agreed not to compromise any potential bonus in negotiating any other contract issues with TRIP. Finally, Brown & Root promised to pay not less than $13,500.00 per day to both Lane and Moore

as an early completion bonus within 30 days of the receipt of payment from the owner.

78. Three sections of the change orders and the subcontracts are particularly significant. Section 1.0 of Change Orders 6 and 4 states:

Within 30 days of receipt by General Contractor, Subcontractor will receive thirty-one and one-half percent (31.5%) (or equivalent of $13,500.00 per day of earned bonus whichever is greater) of all Incentive Bonus monies paid to General Contractor by Owner for early completion of the General Contractors' Work Scope.

Section 4.0 of the Change Orders 6 and 4 states: "Except as amended herein, all Subcontract terms and conditions shall remain unchanged, in full force and effect." General Condition 3.1.4 of the plaintiffs' subcontracts provides:

[P]ayment by Owner to General Contractor is a condition precedent to any obligation of General Contractor to make payment hereunder; General Contractor shall have no obligation to make payment to Subcontractor for any portion of the Sublet Work for which General Contractor has not received payment from the Owner.

79. The construction contract existing at the time the change orders were signed between Brown & Root and TRIP contained a contractor bonus provision for early completion of the DTRE, and TRIP's Amended and Restated Agreement of Limited Partnership included Brown & Root's agreement to subordinate the contractor bonus. Moreover, the financial agreements for the project had been negotiated.

80. On December 12, 1994, Sibert and Wheeler attended a meeting along with Harvey, Kuhn and Aldridge. During that meeting, Williams said that the bonus had been approved and would be paid at the completion of construction. Williams distributed a photocopy of an overhead projector transparency that stated under "Bonus: When construction complete." None of the Brown & Root employees present disputed or challenged Williams's statement. Nonetheless, Wheeler sent the handout the next day to Lane's President, B.F. Wetmore, stating, "Question remains when any payment would be made."

81. Brown & Root did not give plaintiffs a copy of the contractor bonus provisions in its construction contract with TRIP. Brown & Root did not give plaintiffs a copy of the applicable provisions of the financing agreement governing payment of the contractor bonus which were incorporated by reference in the construction contract. Even after plaintiffs asked Brown & Root for complete copies of all applicable contractor bonus provisions in May 1996, Brown & Root delivered only the construction contract. Plaintiffs did not receive the financing agreements until August 1996.

82. Final completion of the DTRE has occurred and final payment is due. Substantial completion of the DTRE occurred 182 days ahead of schedule. Final payment was due no later than May 1996.

83. In sum, the record convincingly reflects the following facts regarding the contractor bonus provisions:

(a) At the time that Brown & Root negotiated the contractor bonus change orders with plaintiffs, Brown & Root knew, but did not disclose to plaintiffs, that the financial projections showed that no bonus could reasonably be anticipated for a period of five to seven years. Brown & Root further knew, but did not disclose to plaintiffs, that the contractor bonus was to be subordinated to the ownership debt. Although a specific addendum to the construction contract relating to the bonus provision had not yet been signed by all the relevant parties at the time the change orders were entered into, the terms in the financing provisions and in the TRIP partnership agreement already in place made clear (i) that no bonus could reasonably be anticipated for five to seven years, and (ii) that it was possible that restrictions imposed by the lenders could result in no contractor bonus at all. Brown & Root's concern about the payment of the contractor bonus can be seen in its insistence on a contractual provision in the partnership agreement specifying the contractor bonus as a continuing obligation of the partnership in the event the lenders restrictions prevented payment of the contractor bonus.

(b) Plaintiffs did not know when they negotiated and entered into the relevant change

orders that the earliest reasonably anticipated pay out was in five to seven years, or that the financial arrangements created a risk that the bonus would not be paid by the owner at all. Plaintiffs rejected Brown & Root's second contractor bonus proposal, which was designed to reduce the risk of substantial delay or nonpayment by the owner, because information and documents material to these risks had been either concealed or withheld from plaintiffs by Brown & Root.

(c) Plaintiffs signed change orders expressly acknowledging that the timing of the payment of the contractor bonus was uncertain, and accelerated performance to achieve substantial completion of the road construction early knowing of that uncertainty.

## II. CONCLUSIONS OF LAW

Plaintiffs assert four claims against Brown & Root: two separate counts of breach of contract, one count of fraud and one count of unjust enrichment.[19] Of the two contract claims, one concerns the plaintiffs' claim for changes in the scope of work, while the second concerns the contractor bonus for early completion of the project. Subject matter jurisdiction over this suit exists pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties' citizenship is diverse.[20]

## A. Breach of Contract—Count I: Scope of Work

■ In their first Count, plaintiffs seek compensation for the work they performed stemming from the design changes that were significant changes in the scope of work under the subcontracts, including changes in the guard rail and changes in the thickness of the sub-base materials. Under Special Condition 38 of the subcontracts, plaintiffs are entitled to additional compensation for work orders from design changes that changed the scope of work on the DTRE. Yet under General Condition 3.1.4 of the subcontracts, there is a condition precedent to that entitlement, namely, payment for the scope change work orders by the owner, TRIP, to the general contractor, Brown & Root.[21] Plaintiffs acknowledge that the condition precedent to payment has not occurred. Nonetheless, they argue that they are entitled to compensation under the subcontracts because the condition precedent has been waived or excused by Brown & Root's misconduct, particularly (i) in concealing from the lenders the likelihood of changes in scope and (ii) in concealing from the subcontractors the resulting lack of funding for changes in scope.

■ Well-settled principles dictate that a party seeking to recover on a contract in Virginia must allege and prove performance of any express conditions precedent upon which the right of recovery depends.[22] Under Virginia law, the language of the contract determines whether a "pay when paid" clause is a condition precedent that provides a defense to contractual liability: if a contract is clear on its face, and either reasonably contemplates eventual payment by the general contractor to the subcontractor or expresses a clear condition precedent that must be fulfilled before payment comes due, the contract will be construed as written and will not be judicially reformed through the introduction of parol and other extrinsic evidence of a contrary intent. *See, e.g., Galloway Corp. v. S.B. Ballard Construction Co.,* 250 Va. 493, 501, 464 S.E.2d 349 (1995). Where, as here, the parties use terms such as "condition precedent" in a pay-when-paid

---

**19.** Plaintiffs also asserted a breach of surety agreement against defendant Highlands Insurance Company that was resolved by summary judgment. *See Moore Brothers Construction Co. v. Brown & Root, Inc.,* 962 F.Supp. 838 (E.D.Va. 1997).

**20.** Virginia law applies here because (i) a choice of law provision in the subcontracts specifics that Virginia law shall control and because (ii) a federal court sitting in diversity jurisdiction applies Virginia law, *see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

**21.** As noted above, General Condition 3.1.4 in each of the subcontracts states, "[P]ayment by Owner to General Contractor is a condition precedent to any obligation of General Contractor to make payment ... to Subcontractor ..."

**22.** *See Lerner v. Gudelsky Co.,* 230 Va. 124, 133, 334 S.E.2d 579 (1985); *see also Winn v. Aleda Construction Co.,* 227 Va. 304, 307, 315 S.E.2d 193 (1984) ("When a contract provides for the performance of special conditions precedent before a party is entitled to payment, the conditions must be performed unless the other party prevents or waives their performance.").

clause, the intent of the parties to shift risk of nonpayment to subcontractors is clearly established. *See id.* (citing *Gilbane Building Co. v. Brisk Waterproofing Co., Inc.*, 86 Md. App. 21, 585 A.2d 248, 250 (1991)). In other words, because General Condition 3.1.4 expressly uses the phrase "condition precedent," the subcontracts' pay-when-paid clause is, under Virginia law, a clear and enforceable condition precedent to any payment from Brown & Root for changes in the scope of work.

■ Yet, this conclusion does not end the analysis, as Virginia law recognizes the "prevention doctrine." Under this doctrine, proof of "active conduct preventing or hindering the fulfillment of the condition," and proof that "the condition would have occurred or the performance of the return promise [would have] been rendered except for such prevention or hindrance" may excuse or waive the performance of a condition precedent. *See Parrish v. Wightman*, 184 Va. 86, 92–93, 34 S.E.2d 229 (1945). Here, Brown & Root (i) concealed from the lenders its expectation that changes in scope would occur,[23] (ii) signed the construction contract, from which the changes in scope had been deleted at the lenders insistence, (iii) did not disclose to plaintiffs the relevant provisions in the financing agreements, including the provisions relating to the lenders right to refuse payment for changes in scope, and (iv) ordered plaintiffs to perform the work stemming from changes in scope with knowledge, not available to plaintiffs, that no sources of

funding of payment for the extra work could realistically be said to exist. This conduct effectively "prevent[ed] or hinder[ed] the fulfillment of the condition" with regard to payment for the changes in scope of work.[24] Had Brown & Root not concealed the likelihood or probability of design changes and hence scope of work changes, the lenders would have insisted on further funding by the project owners to cover that contingency.[25] In other words, in the absence of Brown & Root's active conduct in concealing the substantial possibility, indeed likelihood, that changes in scope of work would be required, money would have been available to pay Brown & Root for the change in scope claims to satisfy the condition precedent. Alternatively, plaintiffs, armed with knowledge that changes were not funded, could have refused to agree to the pay-when-paid condition. Thus, Brown & Root prevented or substantially hindered the satisfaction of the condition precedent.

■ The details of Brown & Root's conduct in this regard merit emphasis. Thus, Brown & Root was aware of the lack of funding for the owner to pay Brown & Root for the scope change work orders when Brown & Root ordered plaintiffs to perform the work. By May 1994, Brown & Root knew that the project was seriously over-budget, and that the lenders were unwilling to pay for any changes in scope. Moreover, Brown & Root knew that its own equity contribution had already reached the limit allowed under its own guidelines, and that it

---

23. This concealment was carried out by Brown & Root in agreement with TRIP through (i) the agreement to the transfer of the examples deleted at the lenders insistence from the prime construction contract to the Policy and Procedures Letter, (ii) through the express warranties made to the lenders that no changes in the scope of work were anticipated despite Brown & Root's knowledge that the drawings were subject to revision and approval by the VDOT, and that issues as to one change in scope, namely the thickness of the sub-pavement, had not yet been fully resolved, and (iii) through its continued concealment of the Policy and Procedures Letter at the request of TRIP's Williams.

24. *See Parrish*, 184 Va. at 92–93, 34 S.E.2d 229 (" 'It is as effective an excuse of performance of a condition that the promisor has hindered performance as that he has actually prevented it.' "); *see also Boggs v. Duncan*, 202 Va. 877, 882, 121

S.E.2d 359 (1961) ("[H]e who prevents a thing may not avail himself of the nonperformance which he has occasioned.").

25. Of course, mere speculation and conjecture about what might have happened will not satisfy the requirements of the prevention doctrine. *Lerner*, 230 Va. at 133, 334 S.E.2d 579. Yet, that is not this case, as the lenders' emphasis on, and continuing concern about, the potential for scope changes transforms this statement from mere speculation and conjecture to a reasonable likelihood. Given this, it is apparent that Brown & Root's conduct substantially contributed to the non-occurrence of the pay-when-paid condition. *See also Shear v. National Rifle Association of America*, 606 F.2d 1251, 1257 (D.C.Cir.1979) (plaintiff must only show that defendant's conduct "substantially contributed" to non-occurrence of condition).

and Autostrade had previously declined to contribute additional equity. Finally, Brown & Root was also aware that any refinancing attempt faced a serious obstacle due to the Note Agreement's "make whole premium." A company cannot create the conditions for failure of the condition precedent, and then use the condition precedent to avoid liability for work it ordered performed knowing that the condition precedent could not be satisfied.

The pay-when-paid condition precedent therefore, under Virginia law, must be excused or deemed waived as to the payment due for additional work performed due to changes in the scope of work. Accordingly, Brown & Root is liable to Lane in the amount of $1,474,530.30 plus interest from the date of the arbitrator's final award at the Wall Street Journal Prime Rate and to Moore in the amount of $2,154,147.01 for compensation for changed scope of work claims. *See Moore Brothers*, 962 F.Supp. at 842.[26]

## B. Breach of Contract—Count II: Contractor Bonus

■ In their second Count, plaintiffs argue that (i) the early completion bonus is due and owing under the subcontracts and the change orders to the subcontracts, because the "pay when paid" language of the change orders is latently ambiguous under Virginia law and therefore should be construed in this context as relating to time of payment rather than as a condition precedent that shifts the risk of insolvency to the subcontractors, and (ii) that, as is true with respect to the payment for changes in the scope of work, the unfulfilled condition precedent has been waived or excused by Brown & Root's conduct. Plaintiffs' contractual language contention must be addressed before its prevention argument, as the resolution of this issue may eliminate the need to reach the latter.

■ While the "pay when paid" language in the subcontracts is an unambiguous condition precedent under Virginia law, the same cannot be said of the language in § 1 of the change orders. The change order language is infected with a latent ambiguity, as it simply states that "[w]ithin 30 days of receipt by General Contractor, Subcontractor will receive thirty-one and one-half percent ... of all Incentive Bonus monies." Under *Galloway*, the seminal case addressing pay-when-paid clauses under Virginia law, a latent ambiguity "exists when language is of doubtful import, admits of being understood in more than one way, admits of two or more meanings, or refers to two or more things at the same time." *See Galloway*, 250 Va. at 502, 464 S.E.2d 349. There, the Supreme Court of Virginia found that language quite similar to the change order language, namely "after the Contractor receives payment from the Owner" and "has received payment from the Owner," contains latent ambiguities. *See id.* at 503, 464 S.E.2d 349.[27] Because the contracts and change orders contained no additional language that would allow either a finding that the parties contemplated payment within a reasonable time or a finding that parties clearly understood these terms to assert a condition precedent on payment, resort to extrinsic and parol evidence is appropriate to determine whether, under Virginia law, there was a meeting of the minds as to that term of the contract. *See id.* at 503–04, 464 S.E.2d 349.[28]

---

**26.** Lane's contract entitles it to interest at the Wall Street Journal Prime Rate of 8.75% on any unpaid amount properly due and not in dispute. Under these terms, Lane is entitled to prejudgment interest on the amount due for breach of contract as this amount has been liquidated and undisputed between Brown & Root and Lane since the arbitrator's award; the only question at issue here was not the amount of the payment for changes, but the right to the payment. *Cf. Richmond v. County of Henrico*, 185 Va. 176, 199, 37 S.E.2d 873, 884 (1946) (holding that interest ought not to be allowed when the accounts are unliquidated and disputed between the parties). Moore does not seek prejudgment interest on this amount, and thus none is awarded.

**27.** Here, the phrase used is even more reasonably construed as addressing time of payment rather than risk of insolvency, and thus creating a latent ambiguity, than the phrase at issue in *Galloway*, because it expressly refers to an agreed time frame, *i.e.*, within 30 days after receipt of payment. The phrase in *Galloway* included no similar time frame reference

**28.** To be sure, the change orders incorporated the provisions of the subcontracts, including the unambiguous condition precedent. Yet, such incorporation was expressly limited by the phrase, "except as amended herein." As there is (i) no clarification or further identification of which portions of the subcontracts remained unamend-

■ Only if both parties manifested the same intent with respect to the ambiguity will that intent be enforced. *See Galloway*, 250 Va. at 503, 464 S.E.2d 349. The record reflects that Brown & Root fully intended § 1 of the change order to set forth a condition precedent to payment, and the general incorporation clause to incorporate unamended the express condition precedent contained in the subcontracts. Yet, plaintiffs' witnesses provided equally unequivocal testimony that they understood the issue being negotiated in the change orders was whether the payment would be at substantial completion, final completion, or within 90 days after final completion. In other words, plaintiffs did not understand that the issue involved in the clause was which party bore the risk of the owner's insolvency or inability to pay; plaintiffs were unaware that there was any risk that the contractor bonus would not be paid for years, much less a risk that it would not be paid at all, and thus did not understand that assumption of those risks was at issue.[29] Moreover, their rejection of the bonus proposal that would have redistributed that risk, and their subsequent design of a counterproposal that in no way addressed the risk, further supports the conclusion that there was no meeting of the minds on the

issues addressed in § 1 of the change order, or in the meaning of the clause generally incorporating the provisions of the subcontract. *See Galloway*, 250 Va. at 503–04, 464 S.E.2d 349 (if no manifestation of same intent, no meeting of minds and intent of one party does not control). In these circumstances, Brown & Root has failed to carry its burden to prove that the parties mutually intended the contract to create a condition precedent pay-when-paid defense.[30] Given this, the pay-when-paid clause is not a condition precedent, and Brown & Root is liable to the subcontractors for breach of the contractor bonus change orders. Specifically, Brown & Root is liable to both Lane and Moore, each in the amount of $2,457,000.[31]

## C. Fraud in the Inducement and Performance—Count IV

■ Plaintiffs next claim that Brown & Root fraudulently induced them to enter into the early completion bonus change orders and to accelerate their performance. The elements of a claim of fraud in Virginia are: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.[32] *See Winn*, 227 Va. at

---

ed, or, alternatively, which portions of the change orders were intended to amend the subcontracts, and (ii) no direct statement as to insolvency within the change order itself, such a general statement of incorporation does not manifest a clear and unambiguous intention that the condition precedent remain unamended and in full force and effect. As in *Galloway*, the ambiguity "was exposed only after the default of the owner brought the issue into focus," and "the phrases, while appearing perfectly clear at the time the contracts were formed, because of subsequently discovered or developed facts, may reasonably be interpreted in either of two ways." *See* 250 Va. at 503, 464 S.E.2d 349. Thus, it is appropriate to look beyond the contract and determine the intent of the parties using parol and other extrinsic evidence.

29. As in *Galloway*, the change orders are "completely devoid of any unequivocal terms dealing with the possible insolvency of [the owner] to show that the subcontractors assumed the risk of that insolvency." 250 Va. at 503, 464 S.E.2d 349.

30. *See Galloway*, 250 Va. at 506, 464 S.E.2d 349 ("[I]n the absence of a clear and unambiguous statement of the parties' intent as to the meaning of the time of payment provision in a construc-

tion subcontract, an absolute 'pay when paid' defense is available to a general contractor only if it can establish by parol evidence that the parties mutually intended the contract to create such a defense."); *see also Standefer v. Thompson*, 939 F.2d 161, 164 (4th Cir.1991) (noting that the law generally does not favor conditions precedent, though plain language may compel such a construction of contractual provisions).

31. Defendant's Admissions provide sufficient evidence that substantial completion occurred 182 days ahead of schedule, rather than 180 days, as was awarded against Highlands in *Moore Bros. See Moore Bros.*, 962 F.Supp. at 840 n. 1. Because the parties have not adequately addressed the date from which prejudgment interest would be due, further briefing on this issue will be required.

32. Damages for fraud are measured by the extent of any detrimental reliance by the plaintiff on the representations of the defendant; where the plaintiffs do not actually lose anything there can be no recovery in fraud. *See Murray v. Hadid*, 238 Va. 722, 731, 385 S.E.2d 898 (1989); *Community Bank v. Wright*, 221 Va. 172 175, 267 S.E.2d 158 (1980).

308, 315 S.E.2d 193. The burden is on the plaintiffs to prove each element of fraud by clear and convincing evidence. *See id.*

The reliance element is the Achilles' heel of this claim. Although plaintiffs have proven misrepresentations or omissions of material facts as to the contents of (i) the agreement between Brown & Root and TRIP, (ii) the agreement between TRIP and the lenders, and (iii) as to the effect of those agreements on the agreement between Brown & Root and its subcontractors,[33] they have not proven by clear and convincing evidence that they detrimentally relied on these misrepresentations and were damaged thereby. Specifically, plaintiffs have not proven by clear in convincing evidence that the loss of the right to stop work for non-payment for the scope change works orders, the only fraud damage plaintiffs assert, is attributable to reliance on the misrepresentations or omissions by Brown & Root.[34] Plaintiffs accelerated performance knowing that the date of payment was uncertain.[35] To be sure, plaintiffs were not aware of the extent of the possible delay because of Brown & Root's concealment of the terms of financing provisions and its anticipation of a five to seven year time frame. Yet, plaintiffs expressly accepted some uncertainty and accelerated performance despite that uncertainty. The record does not warrant a finding that plaintiffs would not have accelerated performance had they been aware of the extent of the likely delay in the payment of a bonus; plaintiffs' signing the change order acknowledging that time of payment was uncertain and accelerating despite that uncertainty suggests that timing was not crucial to their decision to accelerate. Accordingly, plaintiffs have not demonstrated by clear and convincing evidence the requisite reliance on Brown & Root's misrepresentations.[36]

### D. Unjust Enrichment

It is a well-settled principle under Virginia law that unjust enrichment claims arise only where there is no express contract.[37] Here, the express contract gov-

**33.** Specifically, plaintiffs have demonstrated that the preamble to the change orders, as well as representations made by Harvey, that the time and payment of the contractor bonus to Brown & Root were undetermined and uncertain, were knowing misrepresentations of existing fact made with intent to mislead.

**34.** *See Harris v. Dunham*, 203 Va. 760, 767, 127 S.E.2d 65 (1962) ("[O]ne who seeks to hold another in fraud must clearly show that he has relied upon the acts and statements of the other."); *Piedmont Trust Bank v. Aetna Cas. & Sur. Co.*, 210 Va. 396, 171 S.E.2d 264 (1969) ("[T]he element of reliance, an essential element of fraud, was absent and, in those circumstances, there could be no fraud.").

**35.** As late as December 1994, Lane's executive acknowledged that questions as to when any bonus payment would occur remained.

**36.** Thus, the problem of valuing the damage asserted, namely the loss of the right to stop work for non-payment, need not be addressed. Yet, it is worth noting that this issue might also bar recovery for fraud as damages may be wholly speculative. *See Thomason v. Mosrie*, 134 W.Va. 634, 60 S.E.2d 699 (1950) (plaintiff cannot recover speculative damages in action for fraud); *see also* 8B, Michie's Jurisprudence, Fraud and Deceit, § 70 ("The general rule in actions for fraud and deceit is that one injured thereby is entitled to recover such damages as will compensate him for the loss or injury actually sustained and as will place him in the same position that he would have occupied had he not been so

defrauded."). Moreover, plaintiffs' claim of a contractual right to stop working is itself doubtful given that General Condition 8.2.5 and Special Condition 34.1 of both subcontracts required plaintiffs to "continue to perform the Sublet Work pending resolution of any claim," and that Exhibit D to the subcontracts, setting forth the arbitration procedure, provides that the subcontractors have the right to stop work *unless* directed by Brown & Root to perform. Because the arbitrator's initial award finally resolving the claims was handed down after the original completion date, and because Brown & Root directed continuing performance, the existence of any such contractual right to stop working is doubtful. In any event, the lack of reliance is dispositive and this issue is not reached.

**37.** *See Vollmar v. CSX Transportation*, 705 F.Supp. 1154, 1176 (E.D.Va.1989); *see also In re Virginia Block Co.; Virginia Block Co. v. Virginia Mutual Ins. Agency, Inc.*, 16 B.R. 771, 774 (Bankr.W.D.Va.1982) ("In no event, however, will a court impose an implied contractual relation on parties in contravention of an express contract."); *Royer v. Board County Supervisors*, 176 Va. 268, 280, 10 S.E.2d 876 (1940) ("Manifestly when one has furnished services under an express contract which provides that he is not to be compensated therefor unless a certain contingency occurs and, through no fault of the other party, that contingency does not happen, he can not disregard the express terms of his agreement and recover for the value of the services rendered."); *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 491 (4th

erns the payment of the contractor bonus. Thus, the claim for unjust enrichment must fail.

## III. CONCLUSION

For the reasons stated herein, Brown & Root is liable (i) to Lane in the amount of $1,474,530.30 plus prejudgment interest for breach of contract for changes in scope, (ii) to Lane for breach of the contractor bonus change orders in the amount of $2,457,000.00, (iii) to Moore in the amount of $2,154,147.01 for breach of contract for changes in scope, and (iv) to Moore in the amount of $2,457,-000.00 for breach of the contractor bonus change orders. The question whether plaintiffs are entitled to prejudgment interest on the contract bonus award requires further briefing, and final judgment will be entered following disposition of this question. Brown & Root is not liable to either subcontractor for fraud or unjust enrichment.

An appropriate Order will issue.

Cir.1992) ("One cannot obtain quantum meruit relief from another if he has expressly delineated the contractual obligations the two will have on the subject in question.").